Chief Judge GIERKE
delivered the opinion of the Court.
This Court has repeatedly reaffirmed that the military judge is the “last sentinel” in the trial process to protect a court-martial from unlawful command influence.[1] Here, the primary issue is whether the military judge properly performed his sentinel duties when confronted with some.unusual circumstances surrounding the convening authority being present in the courtroom during a portion of *15 the court-martial. We hold that these trial developments raised the issue of unlawful command influence. The military judge failed to inquire adequately into this issue and failed to place the appropriate burden on the Government to rebut the existence of the command influence or to establish that it did not prejudice the proceedings. Therefore, the military judge erred in failing to perform his sentinel duties. For the reasons stated below, we reverse the decision of the lower court.
At the outset we note that we granted review on three issues.[2] Here, we focus on Issue I (the unlawful command influence issue) and also address Issue II (denial of speedy appellate review). Appellant’s claim as to Issue II is meritorious, thereby entitling her to additional relief. But the merits of Issue II also impacts the remedy we fashion to address the error relating to Issue I. Because of the error relating to unlawful command influence and the remedy we find appropriate, it is not necessary for us to address Issue III (improper sentence reassessment).
I. BACKGROUND
The operative facts are not in dispute and are presented accurately by the lower court:
The convening authority at the time the appellant’s court-martial was convened and the charges referred was Major P.J. Loughlin, United States Marine Corps, Commanding Officer of Headquarters and Headquarters Squadron (H&HS), Marine Corps Air Station, Yuma, Arizona. He signed the convening order, detailing five officer members. He also signed the amendment to the convening order detailing four enlisted members and removing an officer member. After challenges, one officer and three enlisted members remained to hear the case. By the time trial on the merits commenced before those four members, Lieutenant Colonel M.L. Saunders had succeeded Major Loughlin in command and Major Loughlin assumed duties as Executive Officer [XO]. After the trial counsel finished his closing argument on findings, there was a brief recess before the military judge gave instructions to the members. After the recess, in an Article 39a, UCMJ, 10 U.S.C. § 839a, session, the following discussion ensued:
MJ: The court will come to order. All parties present when the court recessed are again present.
The members are absent.
During the last recess — I guess I should say during the closing arguments of counsel the courtroom was pretty full of spectators. I saw an individual come in, sit down in the courtroom. During the last recess I just said to the trial counsel, who’s the man in the flight suit? He told me it was the XO of the Squadron which happens to be our convening authority in this case, the individual [who] actually picked the members, referred the case to trial, sat in on closing arguments. I want to make that part of the record.
*16 Defense, do you want to be heard on this?
DC: Yes, sir, we do. We’d like to ask for a mistrial at this point because of his presence. It was obvious — I didn’t know he was there at the time. It with [sic] obvious during the whole closing argument that the panel was looking over our shoulder.
MJ: I didn’t see that.
DC: We believe Captain Cisneros, the President, is intimately familiar with Major Loughlin.
MJ: Well, she may be the only individual that knows him because the other enlisted members are not from that Squadron and I have no idea whether they even recognized or knew who he was. I can tell you that I’m about as far away from him as they were and I couldn't even tell whether he was an officer or not because he was in a flight suit. I couldn’t see any rank insignia on his name patch.
DC: But Captain Cisneros knows him. MJ: Oh, I know she does.
DC: And it’s a small base. Everybody knows the XO of H&HS. It’s our opinion that he’s going to influence their deliberation and influence the weight. He heard all the evidence, you know, and they’re going to be influenced by that fact.
MJ: Okay. Your motion for a mistrial is denied. But, if you desire, I will give a limiting instruction, but that’s a choice you’re going to have to make on the limiting instruction in whether you want to highlight it to the members, specifically if the enlisted members did not know who he was, or whether you want me to give them a limiting instruction telling them that they should not consider it whatsoever, the fact that the convening authority sat in for the closing arguments.
DC: No, we’re not going to highlight it at this time.
MJ: Do you have any other remedy that you would desire?
DC: There’s no other remedy that would be effective other than a mistrial, but that’s not an option.
MJ: Well, you’re not getting a mistrial so is there anything else you want?
DC: Nothing else we can ask for.
MJ: Then I’ll be glad to give a limiting instruction.
DC: No, sir.
MJ: Do you desire to voir dire any of the members?
DC: No, sir.
MJ: Anything else we need to take up? TC: No, sir.
MJ: Staff Sergeant Perez, let’s call the members in.
The Article 39(a) session terminated.[3]
Following the session pursuant to Article 39(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 839(a) (2000), the military judge, the trial counsel, and the trial defense counsel took no further action to address the issue of unlawful command influence. The court-martial eventually convicted Appellant on charges of conspiracy, false official statement, wrongful use of lysergic acid diethylamide (LSD), methamphetamine, and cocaine, wrongful inhalation of “Glade” aerosol with the intent to become intoxicated, wrongful possession of methamphetamine and cocaine, and communication of a threat (two specifications).[4]
On appeal Appellant asserts that the military judge failed to conduct further inquiry to establish what impact, if any, the convening authority’s presence had on the proceedings and erred in summarily denying the defense’s motion for mistrial. More specifically, Appellant makes four points to support this argument: (1) the facts surrounding the *17 convening authority’s presence in the courtroom satisfy the low threshold in Biagase[5] of demonstrating some evidence of unlawful command influence; (2) the military judge failed to conduct further inquiry to establish what impact the convening authority’s presence had on the proceedings; (3) the military judge erred in failing to shift the burden to the Government to disprove the existence of unlawful command influence; and (4) the Government did not adequately rebut the presumption of unlawful command influence beyond a reasonable doubt.
The Government reply is simply that the military judge did not abuse his discretion in denying the defense motion for a mistrial. The Government asserts that the mere presence of the convening authority at the closing argument does not raise the issue of unlawful command influence as there was no evidence that his presence had any effect on the members’ deliberations. Indeed, the Government argues that “the presence of the convening authority should be presumed to have a salutary effect” because it “demonstrates to all participants and the command the convening authority’s interest” in observing military justice in action.
II. DISCUSSION
A. Issue I: Alleged unlawful command influence
1. The analytical framework for addressing the issue of unlawful command influence
Recently in Gore, we discussed the statutory prohibition against unlawful command influence and explained the pivotal role of this Court in protecting against unlawful command influence, stating:
Unlawful command influence is prohibited under Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2000), which states,
No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any ease....
The importance of this prohibition is reflected in our observation, that “a prime motivation for establishing a civilian Court of Military Appeals was to erect a further bulwark against impermissible command influence.” United States v. Thomas, 22 M.J. 388, 393 (C.M.A.1986).[6]
Our responsibility to protect the military justice system against unlawful command influence comes from our statutory mandate to provide oversight of the military justice system.[7] We share this responsibility with military commanders, staff judge advocates, military judges, and others involved in the administration of military justice. Fulfilling this responsibility is fundamental to fostering public confidence in the actual and apparent fairness of our system of justice. It is the experience of this Court that unlawful command influence is not a virus that a onetime judicial remedy, treatment, or inoculation can irrevocably extinguish from our military justice community.[8] On the contrary, because the inherent power and influence of command are necessary and omnipresent facets of military life, everyone involved in both unit command and in military justice must exercise constant vigilance to protect *18 against command influence becoming unlawful.
Illustrative of this shared responsibility to protect against unlawful command influence, in Biagase,[9] we explicitly stated that a primary duty of the military judge in a court-martial is to protect against unlawful command influence. Indeed, Biagase underscored the role of the military judge as the “last sentinel,” an essential guard at the trial level, to protect against unlawful command influence.[10]
Biagase reaffirms the unique and important duties that military judges have when addressing command influence issues. We noted in Biagase the utility of the military judge making detailed findings of fact. But the focus of Biagase is on the military judge’s duty to allocate the burdens between the prosecution and the defense.
In discharging his duty of allocating the burden, the military judge engages in a two-stage process to permit the parties to establish the factual predicate related to any issues of unlawful command influence. The military judge initially requires the defense to carry the burden of raising an unlawful command influence issue. This threshold showing must be more than mere “command influence in the air”[11] or speculation.[12] But because of the congressional prohibition against unlawful command influence and its invidious impact on the public perception of a fair trial, we have stated that this threshold is low.[13] The test is “some evidence” of “facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings.”[14]
If the military judge concludes that the defense has raised the issue of unlawful command influence, the burden shifts to the government to show either that there was no unlawful command influence or that the unlawful command influence did not affect the proceedings.[15] In Biagase, we set forth the three options available to the government: “[T]he Government must prove beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute unlawful command influence; or (3) that the unlawful command influence will not prejudice the proceedings or did not affect the findings and sentence.”[16]
The Biagase analysis we have established for the military judge is rooted in the approach that we have applied on appeal for over a decade. “On appeal, an appellant must ‘(1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness.’ ”[17]
With this well-established analysis to evaluate allegations of unlawful command influence, we proceed to apply this analysis in this case.
2. Our evaluation of both the military judge and the lower court considering the command influence issue
The lower court shared the apparent view of the military judge that the defense did not meet its burden of raising the issue of *19 unlawful command influence.[18] The lower court reasoned that the mere presence of the convening authority was insufficient to raise the issue of unlawful command influence and that the trial defense counsel only had presented “an unsupported allegation ... [supported only by] speculation.”[19] Specifically, the lower court explained that there was no evidence that the members either saw or recognized the convening authority, or that his presence influenced the members.[20]
In light of the ruling of both the military judge and the lower court, the pivotal issue is whether the trial defense counsel carried the initial burden of raising the unlawful command influence issue. Our sole concern here is whether the defense produced “some evidence” of “facts which, if true, constitute unlawful command influence and that the alleged unlawful command influence has a logical connection to the court-martial in terms of its potential to cause unfairness in the proceedings.”[21] We review this issue de novo.[22]
At the outset we hold that there are errors in the analysis of both the lower court and the military judge. Indeed, we conclude that the military judge erred in applying the Biagase analysis. First, he erred in concluding that the defense had not produced “some evidence” sufficient to raise the issue of unlawful command influence. Second, having made this error, the military judge never shifted the burden to the Government to prove there was no unlawful command influence.
As both the lower court and the military judge erred in concluding that the defense had not produced “some evidence” sufficient to raise the issue of unlawful command influence, we address this error first.[23]
In our view, the record establishes the low threshold of “some evidence” to raise the issue of unlawful command influence.[24] To his credit, the military judge spotted the potential unlawful command influence issue but then failed to apprehend the significance of this issue in the context of the trial developments.
At trial it was the military judge who lanced open the unlawful command influence issue when the convening authority appeared in the courtroom during the closing arguments. The military judge raised the issue of command influence in an ex parte inquiry to the Government counsel at the first available recess. Major (MAJ) Loughlin’s appearance created enough of a concern that the military judge then felt it necessary to raise the issue on the record in an Article 39(a), UCMJ, session.
Several circumstances made the convening authority’s presence in the courtroom particularly problematic. First, MAJ Loughlin was wearing his flight suit when he entered the courtroom, and throughout the trial of this case the Government characterized Appellant’s misconduct as a direct threat to the safety of the aviation community.
Second, although the military judge explicitly stated that he had “no idea” whether the members recognized MAJ Loughlin or whether they knew who he was, the trial developments were inconsistent with this assertion, and in fact established the members’ knowledge of the convening authority. We acknowledge that trial defense counsel, as an *20 officer of the court, characterized the relationship between MAJ Loughlin and the senior member as “intimately familiar.”[25] But what we also consider important here is that trial defense counsel had unsuccessfully challenged for cause the senior member because she personally knew the convening authority and was a subordinate member of his command. Indeed, the military judge expressly acknowledged that the senior member and MAJ Loughlin knew each other.
Third, the trial defense counsel specifically asserted that it was “obvious during the whole closing argument that the panel was looking over our shoulder.” While the military judge replied that he “didn’t see that,” he did not inquire further into this matter. In light of all the other trial developments, we conclude that the military judge’s observations are insufficient to negate the other evidence of possible unlawful command influence.
Here, we share the military judge’s judicial instinct in questioning the presence of the convening authority at the court-martial. A court-martial is a public trial.[26] There is no rule that the convening authority cannot attend a court-martial.[27] But, as this case illustrates, the presence of the convening authority at a court-martial may raise issues.
Therefore, before attending a court-martial, a convening authority should give prudent and careful consideration as to the impact one’s presence could have on both the proceedings and the perception of fairness of the court-martial. In this regard, we encourage a convening authority to initiate a dialogue with both the command staff judge advocate and the trial counsel before entering a courtroom. Discussing this matter with these lawyers would permit them to advise the convening authority of both general and case specific issues that may be raised by the convening authority’s presence at the court-martial. It would also afford the trial counsel the opportunity to advise both the military judge and the trial defense counsel of the presence of the convening authority in advance, so that the matter can be discussed with the military judge and any issues litigated before the convening authority is present in court before the panel members.
The military judge and the lower court focused on the failure of the trial defense counsel to avail himself of the opportunity that the military judge gave to voir dire the panel. This view misapprehends the law regarding unlawful command influence.
Again, we reaffirm that the law of unlawful command influence establishes a low threshold for the defense to present “some evidence” of unlawful command influence.[28] Long ago in United States v. Rosser[29] we made clear that this Court will be vigilant in protecting a court-martial from improper influence by the convening authority. In Rosser, we held that the military judge failed to make an appropriate “inquiry into the particular facts and circumstances” regarding the “eavesdrop[ping]” of a company commander and accuser in the case, on court-martial proceedings.[30] We reversed the case because the military judge was “remiss in his affirmative responsibilities to avoid the appearance of evil in his courtroom and to foster public confidence in court-martial pro *21 ceedings.”[31] Our holding in Rosser is rooted, in part, in our concern about the impact on a court-martial of the presence of the convening authority at trial. In light of this precedent and the facts of this case, we hold the trial defense counsel here met the low threshold of presenting “some evidence” of unlawful command influence.
The military judge misevaluated the evidence that raised the issue of unlawful command influence. In the case before us, we have “some evidence” which could constitute unlawful command influence. The military judge then compounded the impact of this error by not calling upon the Government to rebut the existence of the command influence or to establish that it did not prejudice the proceedings.
Let there be no misunderstanding, we do not hold that the military judge was required to grant the defense motion for a mistrial based on the evidence before him at that time. Instead, as the “last sentinel” at trial to protect against unlawful command influence, the military judge had a duty to inquire further into this matter. As he did not and the evidence before him raised the issue of unlawful command influence, our attention is directed to the military judge’s errors relating to failure to allocate properly the burden between the parties as required by Biagase. We now turn to the remedy we should employ to address this unresolved appearance of unlawful command influence.
3. The remedy
A military judge is empowered to protect against unlawful command influence. Also, the military judge has great discretion in fashioning a remedy.[32] But, as the military judge misapprehended the nature and degree of the potential unlawful command influence here, he did not call upon the Government to meet its burden nor did he take corrective action that might have permitted the trial to proceed fairly. Therefore, this Court must fashion a remedy for the error in this case.
Appellant seeks a dismissal with prejudice as a remedy. Responding to this claim for relief, we find guidance in our precedent stating: ‘We have long held that dismissal is a drastic remedy and courts must look to see whether alternative remedies are available.”[33] We further reasoned that “dismissal of charges is permissible when necessary to avoid prejudice against the accused and the findings of fact of the military judge documented the prejudice to Appellant from the egregious error in this case____’[34] Applying this precedent here we consider several factors: the nature of the error, alternative remedies, and possible prejudice to Appellant.
Initially, we focus on the nature and severity of the problem. Here, we have unrebutted evidence raising the issue of unlawful command influence in the courtroom. It is an undisputed fact that MAJ Loughlin, the officer who convened the court-martial, was present in his flight suit in the courtroom during closing arguments of counsel on findings. This occurred after the Government had characterized Appellant’s misconduct throughout the trial as a direct threat to the safety of the aviation community. Also, the senior member was a member of MAJ Loughlin’s squadron. She therefore had an understanding of his position and knew him. Again, the failure of the military judge to allocate the burden between the parties resulted in an inadequate factual basis as to the exact nature and extent of any unlawful command influence that might have been created with regard to the senior member, or any other members of the court-martial.
This situation invites us to consider possible methods to obtain these facts. We have embraced an evidentiary hearing in United States v. DuBay[35] as a method to develop facts necessary for appellate review.[36] The *22 so-called “DuBay hearing” has since become a well-accepted procedural tool for addressing a wide range of post-trial collateral issues.[37] Such a hearing possibly would afford the parties the opportunity to address both the nature and the extent of the command influence, and its impact on the proceedings. But we reject this alternative remedy for three reasons.
At an evidentiary hearing, the predicate facts that raise the issue of unlawful command influence will not be in dispute. This is so because the evidence of unlawful command influence stems from the undisputed fact that MAJ Loughlin, the officer who convened the court-martial, was present and in his flight suit during closing arguments of counsel on findings. It is also undisputed that at least one of the court-martial members knew MAJ Loughlin well. Indeed, that member was the senior member of the panel and was a subordinate in the chain of command to MAJ Loughlin.
Therefore, the Government has two options: (1) show that these facts did not rise to the level of unlawful command influence; or (2) establish that the convening authority’s presence had no prejudicial impact.[38]
We have stated that where the question of unlawful command influence involves court members, Military Rule of Evidence (M.R.E.) 606(b) limits the government’s opportunity to establish that the unlawful command influence had no impact on the proceedings:
This rule prohibits inquiry into two types of matters: (1) “any matter or statement occurring during the course of the deliberations,” and (2) “the effect of anything upon [a] member’s or any other member’s mind or emotions as influencing the member to assent to or dissent from the findings or sentence or concerning the member’s mental process in connection therewith[.]”
The rule has three exceptions to the first prohibition, one of which permits testimony about “any matter or statement” occurring during the deliberations when there is a “question whether ... there was unlawful command influence.” The exceptions, however, do not permit circumvention of the second prohibition (inquiry into the effect on a member).[39]
Therefore, in light of M.R.E. 606(b), there could only be an inquiry of the members regarding what, if anything, was said during deliberations about the commander’s presence in the courtroom and their relationship with him. No one could question the members, however, as to the impact of the convening authority’s presence in the courtroom “on any member’s mind, emotions, or mental processes.”[40]
In considering the option of such a narrowly focused DuBay hearing, we must bear in mind the present posture of this case, including the assertion of excessive post-trial delay presented in granted Issue II. We discuss this issue of post-trial delay in greater detail later in this opinion. It is sufficient at this point to note that Appellant’s claim as to Issue II is meritorious and impacts the remedy we fashion to address the error relating to the alleged unlawful command influence.
We note that the panel’s deliberation occurred almost seven years ago. Because of the serious nature of the error here involving the fundamental fairness of the court-martial and in light of the post-trial delay, a DuBay hearing is not appropriate. The extraordinary unexplained delay here is a significant factor in our declining to order a DuBay hearing.[41]
In this case, the appropriate remedy is to set aside the findings and sentence without prejudice thereby permitting a rehearing. *23 This remedy is proportionate to three circumstances here: (1) the military judge failing to allocate properly the burden between the parties notwithstanding the defense having established “some evidence” of unlawful command influence; (2) the prosecution’s failure to rebut the taint of unlawful command influence; and (3) the excessive and unreasonable post-trial delay.
B. Issue II: Denial of speedy appellate review
Appellant asserts that the 2,031 days for a first-level appellate review by a service court of criminal appeals was a constitutional due process violation. In Tookey v. United States,[42] this Court identified four factors in determining whether post-trial delay violates due process rights: (1) the length of the delay; (2) the reasons for the delay; (3) the appellant’s assertion of his right to a timely review; and (4) prejudice to the appellant.[43] More recently in United States v. Moreno,[44] this Court explained, “Once this due process analysis is triggered by a facially unreasonable delay, the four factors are balanced, with no single factor being required to find that post-trial delay constitutes a due process violation.”[45] Consistent with this precedent, we evaluate these four factors.
1. Length of the delay
Simply stated, the 2,031 days for a first-level appellate review by a service court of criminal appeals is facially unreasonable as it clearly is excessive and inordinate.[46]
2. Reasons for the delay
This is not an unusually long and complex case. Also, there is no reasonable explanation for why it took the convening authority over a year to take action on Appellant’s case. Next, we observe that it took 701 days for Appellant’s case to be briefed by her assigned appellate defense counsel. But we have noted in both Diaz v. Judge Advocate General of the Navy,[47] and Moreno;[48] it is the government that has the ultimate responsibility for the staffing and administrative management of the appellate review process for cases pending before the lower court. Moreover, the Government has failed to present any evidence that the Appellant benefited from the numerous delays requested by the appellate defense counsel. As in both Diaz and Moreno, we decline to hold Appellant responsible for the lack of “institutional vigilance” that should have been exercised in this case.[49]
Also, the Government took 210 days to file a responsive brief at the lower court. The Government has not presented any legitimate reasons[50] or exceptional circumstances for this lengthy period. The ease had been fully briefed and submitted to the lower court for 555 days before the lower court issued its decision. Although this time period is lengthy, we “apply a more flexible review of this period, recognizing that it in *24 volves the exercise of the Court of Criminal Appeals’ judicial decision-making authority.”[51] Nonetheless, under these circumstances, we conclude that this second Barker factor also weighs heavily in favor of Appellant.
3. Assertion of the right to a timely review and appeal
At the lower court, Appellant belatedly asserted her right to a timely review on July 20, 2004. Her failure to object earlier is not a factor that weighs heavily against her.[52] Moreover, as the lower court decided her case within ten days of her belated demand, this factor weighs against Appellant, but not heavily.[53]
4. Prejudice
A final factor is any prejudice either personally to Appellant or to the presentation of her case that arises from the excessive post-trial delay.[54] Important to our analysis is our conclusion that Appellant’s appeal is meritorious as to Issue I, alleging unlawful command influence. As Appellant’s appeal is meritorious, she may have served oppressive incarceration during the appeal period. Appellant was sentenced to confinement for sixty days and she completed her confinement even before the convening authority acted. Therefore, in the unique facts of this case, the appellate delay here did not result in prolonged incarceration that may have been oppressive.
Moreover, we have stated that one facet of prejudice is where an appellant demonstrates “particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision.”[55] Appellant has not made such a showing here.
The final sub-factor focuses on whether there is any “negative impact on [her] ability to prepare and present [her] defense at the rehearing.”[56] We have observed that “Due to the passage of time, witnesses may be unavailable [and] memories may have faded____”[57] “In order to prevail on this factor an appellant must be able to specifically identify how he would be prejudiced at a rehearing due to the delay. Mere speculation is not enough.”[58]
To satisfy this standard, Appellant asserts that a rehearing will be unfair or a DuBay hearing pointless. This generalized assertion of prejudice is insufficient to establish specific harm that she would encounter at a rehearing and she has not demonstrated prejudice.[59]
5. Conclusion — Barker Factors
In balancing the Barker factors, where an appellant has not shown prejudice under the fourth factor, “we will find a due process violation only when, in balancing the other three factors, the delay is so egregious that tolerating it would adversely affect the public’s perception of the fairness and integrity of the military justice system.”[60] The unexplained and unreasonably lengthy delay in this case weighs heavily in Appellant’s favor. On balance, we conclude that Appellant was denied her due process right to speedy re *25 view and appeal notwithstanding her being unable to establish specific prejudice under the fourth factor. We turn next to the relief appropriate for this constitutional violation.
6. Relief afforded to Appellant because of the due process violation for denying a speedy appellate review
As this due process error is one of constitutional magnitude, the burden shifts to the Government to ‘“show that this error was harmless beyond a reasonable doubt.’ ”[61] We are mindful of the fact that Appellant has not demonstrated specific prejudice. However, Appellant has been successful on a substantive issue of the appeal and a rehearing has been authorized. Also, we view the Barker factors weighing heavily in Appellant’s favor. In light of these circumstances, we cannot say that the Government has carried its heavy burden of establishing that this constitutional error arising from the post-trial delay is harmless beyond a reasonable doubt. Moreover, as our balancing reflects, we view the delay in this instance to have been “so egregious that tolerating it would adversely affect the public’s perception of the fairness and integrity of the military justice system.”[62] As to relief from the due process violation arising from the excessive and unreasonable post-trial delay, we seek to fashion a remedy that will afford Appellant meaningful relief. In Moreno we addressed the range of relief options available.[63]
Initially, we note that we, in part, fashioned our relief as to the error arising from Issue I, authorizing a rehearing rather than a DuBay hearing to address the issue of unlawful command influence, because of the excessive post-trial delay in this case. Yet we conclude that further relief is warranted.
As Appellant has served the term of confinement, day-for-day credit for each day of unreasonable and unexplained post-trial delay would provide no meaningful effect. On the other hand, we also view dismissal with prejudice of the charges inappropriate under the circumstances of this case. Again, as in Moreno, we are obliged to fashion a remedy where we have authorized a rehearing and there is presently no direct sentence relief that we can provide Appellant. In this circumstance we will afford Appellant relief by limiting the sentence that may be approved by the convening authority should the rehearing result in a conviction and new sentence.[64]
DECISION
The findings and sentence as approved by the convening authority and the decision of the United States Navy-Marine Corps Court of Criminal Appeals as to both findings and sentence are set aside without prejudice. A rehearing is authorized. In the event that a rehearing is held resulting in a conviction and a sentence, the convening authority may approve no portion of the sentence other than a punitive discharge.

. United States v. Gore, 60 M.J. 178, 186 (C.A.A.F.2004); United States v. Biagase, 50 M.J. 143, 152 (C.A.A.F.1999); United States v. Rivers, 49 M.J. 434, 443 (C.A.A.F.1998).

. This Court granted review on Issue I and Issue II and specified Issue III as follows:
I. WHETHER THE LOWER COURT ERRED IN AFFIRMING THE MILITARY JUDGE’S DENIAL OF A MISTRIAL, WHEN THE MILITARY JUDGE FAILED TO INQUIRE INTO THE CIRCUMSTANCES OF THE CONVENING AUTHORITY’S PRESENCE AT TRIAL OR TO REQUIRE THE GOVERNMENT TO DISPROVE THE EXISTENCE OF UNLAWFUL COMMAND INFLUENCE ONCE THAT ISSUE WAS RAISED.
II. WHETHER A DELAY OF 2031 DAYS BETWEEN SENTENCING AND CONCLUSION OF REVIEW UNDER ARTICLE 66, UCMJ, 10 U.S.C. § 866, COMPORTS WITH DUE PROCESS.
III. WHETHER THE SENTENCE WAS PROPERLY REASSESSED AFTER THE CONVENING AUTHORITY DISAPPROVED A GUILTY FINDING BUT NEITHER THE STAFF JUDGE ADVOCATE’S RECOMMENDATION NOR THE CONVENING AUTHORITY'S ACTION REFLECTS COGNIZANCE OF THE SENTENCE REASSESSMENT CRITERIA UNDER UNITED STATES V. SALES, 22 M.J. 305 (C.M.A. 1986), AND WHERE THE LOWER COURT FAILED TO REVIEW THE CONVENING AUTHORITY’S REASSESSMENT UNDER THE SALES CRITERIA.
United States v. Harvey, 61 M.J. 50 (C.A.A.F. 2005).

. United States v. Harvey, 60 M.J. 611, 613-14 (N.M.Ct.Crim.App.2004).

. These offenses are punishable under Articles 81, 107, 112a, and 134, UCMJ, 10 U.S.C. §§ 881, 907, 912a, 934 (2000), respectively. Appellant was sentenced to confinement for sixty days, reduction to pay grade E-l, forfeiture of $639.00 pay per month for two months, and a bad-conduct discharge. The convening authority disapproved the finding of guilty of wrongful use of LSD and approved the sentence as adjudged.

. 50 M.J. at 150.

. 60 M.J. at 185 (ellipsis in original).

. See Articles 37(a) and 98, UCMJ, 10 U.S.C. §§ 837(a), 898 (2000); see also Noyd v. Bond, 395 U.S. 683, 695, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1969) (recognizing that it was in this Court that "Congress has confided primary responsibility for the supervision of military justice in this country and abroad”).

. See United States v. Stombaugh, 40 M.J. 208, 211 (C.M.A.1994) (detailing "many instances of unlawful command influence” that this Court has condemned).

. 50 M.J. at 152.

. In Biagase, we reaffirmed what we first stated in Rivers, 49 M.J. at 443, that the military judge is the " 'last sentinel’ to protect the court-martial from unlawful command influence.” Id.', see Patricia A. Ham, Revitalizing the Last Sentinel: The Year in Unlawful Command Influence, Army Law., May 2005, at 1.

. United States v. Johnson, 54 M.J. 32, 34 (C.A.A.F.2000) (“However, ‘proof of [command influence] in the air, so to speak, will not do.' ” (quoting United States v. Allen, 33 M.J. 209, 212 (C.M.A.1991))).

. Biagase, 50 M.J. at 150 (citing United States v. Johnston, 39 M.J. 242, 244 (C.M.A.1994)).

. Id. (citing Johnston, 39 M.J. at 244).

. Id. (citations and quotation marks omitted).

. Id. at 151.

. Id.

. United States v. Dugan, 58 M.J. 253, 258 (C.A.A.F.2003) (citing Stombaugh, 40 M.J. at 213).

. Harvey, 60 M.J. at 614.

. Id.

. Id.

. Biagase, 50 M.J. at 150 (citations and quotation marks omitted).

. United States v. Wallace, 39 M.J. 284, 286 (C.M.A.1994) ("Where the issue of unlawful command influence is litigated on the record, the military judge’s findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that this Court reviews de novo.”).

. See Dugan, 58 M.J. at 258 (holding that both the lower court and the military judge erred in concluding that the appellant did not meet the initial burden of raising the issue of unlawful command influence).

. Id. (holding that "to the extent the military judge and the Court of Criminal Appeals concluded Appellant did not meet his initial burden of raising the issue of unlawful command influence, they erred”).

. We afford this assertion little weight, as the voir dire of this member had already established that there was no "relationship” between this member and the convening authority.

. "The sixth amendment right to a public trial belongs to the defendant rather than the public; a separate first amendment right governs the interests of the public and the press in attending a trial." 5 Wayne R. LaFave et al., Criminal Procedure, § 24.1(a), at 450 (2d ed.1999).

. Attendance by the convening authority at a court-martial is subject to the military judge's authority to close the court to the public or specific individuals. See United States v. Short, 41 M.J. 42, 43 (C.M.A.1994) ("The right to an open and public court-martial is not absolute, however, and a court-martial can be closed to the public or individuals can be excluded in the discretion of the military judge.”); Rule for Courts-Martial (R.C.M.) 806(b).

. Biagase, 50 M.J. at 150 (citations and quotation marks omitted).

. 6 M.J. 267, 269-73 (C.M.A.1979).

. Id. at 270-73.

. Id. at 273.

. Gore, 60 M.J. at 186-89; Rivers, 49 M.J. at 444.

. Gore, 60 M.J. at 187.

. Id.

. 17 C.M.A. 147, 37 C.M.R. 411 (1967).

. Indeed, in DuBay, we remanded that case for a factfinding hearing on post-trial claims of unlawful command influence. 17 C.M.A. at 148-49, 37 C.M.R. at 412-13.

. United States v. Fagan, 59 M.J. 238, 241 (C.A.A.F.2004).

. Biagase, 50 M.J. at 151.

. Dugan, 58 M.J. at 259-60.

. Id. at 260.

. United States v. Wilson, 10 C.M.A. 398, 403, 27 C.M.R. 472, 477 (C.M.A.1959) (“From the historic day at Runnymede, in 1215, when the English barons exacted the Magna Carta from King John, a guiding principle in English, and later American, jurisprudence has been that justice delayed is justice denied.”).

. 60 M.J. 100 (C.A.A.F.2004). In Toohey, this Court held that the appellant established a threshold showing of facially unreasonable delay, even without showing prejudice. Id. at 103. This Court remanded to the United States Navy-Marine Corps Court of Criminal Appeals for it to determine whether the lengthy delay violated the appellant’s Fifth Amendment right to due process and whether the delay warranted some form of relief. Id. at 104.

. Id. at 102 (deriving these factors from the Supreme Court’s speedy trial analysis in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

. 63 M.J. 129 (C.A.A.F.2006).

. Id. at 136.

. Here, 370 days passed before the convening authority acted. Another 195 days passed before the case was docketed at the lower court and a total of 2,031 days elapsed between sentencing and the initial decision of the lower court. It took 555 days for the lower court to decide Appellant's case once the Government filed its brief in response to her brief.

. 59 M.J. 34, 38 (C.A.A.F.2003).

. 63 M.J. at 137.

. Id. (citing Diaz, 59 M.J. at 39-40).

. In repeated requests for enlargements at the lower court, the Government’s justification included assertions that appellate Government counsel was “maintaining a significant case load,” and referred to "the volume of criminal appellate work in the division."

. Id.

. Id. at 138.

. See id. (”[T]he weight against [the appellant] is slight given that the primary responsibility for speedy processing rests with the Government and those to whom he could complain were the ones responsible for the delay.”).

. Id. at 138-41.

. Id. at 140.

. Id.

. Id.

. Id. at 140-41 (footnote omitted).

. We note that our recent Moreno opinion prudently leaves open the possibility in any later proceeding for Appellant to demonstrate prejudice arising from post-trial delay and states:
We are mindful of the difficulty that an appellant and his appellate defense counsel may have at this juncture of the process in identifying problems that would hinder an appellant’s ability to present a defense at rehearing. If an appellant does experience problems in preparing for trial due to the delay, a Sixth Amendment speedy-trial motion could appropriately be brought at the trial level.
Id. at 141 n. 19.

. United States v. Toohey, 63 M.J. 353, 361-62 (C.A.A.F.2006).

. United States v. Brewer, 61 M.J. 425, 432 (C.A.A.F.2005) (quoting United States v. Miller, 47 M.J. 352, 359-60 (C.A.A.F.1997)).

. Toohey, 63 M.J. at 362.

. As we stated in Moreno'.
The nature of that relief will depend on the circumstances of the case, the relief requested, and may include, but is not limited to: (a) day-for-day reduction in confinement or confinement credit; (b) reduction of forfeitures; (c) set aside of portions of an approved sentence including punitive discharges; (d) set aside the entire sentence, leaving a sentence of no punishment; (e) a limitation upon the sentence that may be approved by a convening authority following a rehearing; and (f) dismissal of the charges and specifications with or without prejudice. Clearly this range of meaningful options to remedy the denial of speedy post-trial processing provides reviewing authorities and courts with the flexibility necessary to appropriately address these situations on a case-by-case basis.
63 M.J. at 143.

. See id. at 143-44.