# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Senior Airman BRITTNEY L. HALL
## United States Air Force

## ACM 38241 (recon)

## ____ M.J. ____

## 1 August 2014

Sentence adjudged 16 October 2012 by GCM convened at Minot Air Force Base, North Dakota.  Military Judge:  Michael A. Lewis (sitting alone).

Approved Sentence:  Dishonorable discharge, confinement for 30 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

Appellate Counsel for the Appellant:  Major Matthew T. King.

Appellate Counsel for the United States:  Lieutenant Colonel C. Taylor Smith; Major Jason S. Osborne; Captain Matthew J. Neil; and Gerald R. Bruce, Esquire.

*En Banc*

ALLRED, MARKSTEINER, HECKER, MITCHELL, and WEBER
Appellate Military Judges

OPINION OF THE COURT
UPON RECONSIDERATION

This opinion is subject to editorial correction before final publication.

MARKSTEINER, S.J., delivered the opinion of the Court, in which ALLRED, C.J., HECKER, S.J., MITCHELL, J., and WEBER, J., join.  WEBER, J., filed a concurring opinion.

MARKSTEINER, Senior Judge:

A general court-martial composed of a military judge sitting alone convicted the appellant, consistent with her pleas, of violating a lawful order on divers occasions; larceny of military property of a value of over $500; aggravated assault with a loaded firearm; and obstructing justice, in violation of Articles 92, 121, 128, and 134, UCMJ, 10 U.S.C. §§ 892, 921, 928, 934. The adjudged sentence consisted of a dishonorable discharge, confinement for 42 months, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Pursuant to a pretrial agreement, the convening authority approved only 30 months of confinement. He approved the remainder of the sentence as adjudged.

The appellant did not raise any issues on appeal, but this Court specified the following issue pertaining to the appellant's larceny conviction, which involved her entering into a marriage for the purpose of obtaining basic allowance for housing (BAH):

> Whether the appellant's plea of guilty to larceny was rendered improvident by the appellant's providency inquiry statements that "a few days, a week, a week and a half" after the marriage ceremony the appellant and her purported husband "decided to give [the marriage] a try."

In addition to the specified issue, we also examined the providence of the appellant's plea to the larceny charge with respect to whether BAH is "military property." After evaluating those issues, we found the appellant's plea provident, and affirmed the conviction with the exception of the words "military property." *United States v. Hall*, 73 M.J. 645 (A.F. Ct. Crim. App. 2014).

On 6 June 2014 we granted the Government's motion for en banc reconsideration, thereby vacating our previous decision, in order to correct that portion of the decision that conflicts with our superior court's precedent regarding the status of BAH as military property. Having now so reconsidered, we affirm.

*Background*

The appellant was an Airman First Class (A1C) assigned to her first duty station at Minot Air Force Base (AFB), North Dakota. Unmarried enlisted military members assigned to Minot AFB were required to live in the on-base dormitories until they reached the rank of Senior Airman (SrA) and had over three years of service. As of September 2010, the appellant was unmarried, had not attained the rank of Senior Airman, and had less than three years of service. Thus, she was required to live in the dormitories and was not entitled to BAH.

Desiring to live off base, the appellant engaged in a practice known as "ghosting." Ghosting is a term used to describe an Airman who maintains a dormitory room on base

but actually lives off base. Airmen who ghost pay for their off-base residences out of pocket. While ghosting, the appellant actually lived in a two-bedroom apartment in the city of Minot. She shared the apartment with a male, A1C JY, whom she had previously dated, and a female, SrA NK, with whom she had, at the time, a romantic relationship. Like the appellant, A1C JY and SrA NK were also ghosting.

In September 2010, the three engaged in a conversation with SrA CB who also lived in their apartment complex. The appellant and her roommates discussed the financial hardships they were enduring because they were paying for the apartment out of their own pockets. SrA CB suggested that if the appellant and A1C JY got married, they could both receive BAH and be better able to afford living off base.

Over the next week or so, the appellant and A1C JY discussed the idea of getting married in order to receive BAH. They decided to do so and on 28 September 2010 were married in a civil ceremony. On the day of the marriage, the appellant provided a copy of the marriage certificate to the Minot AFB finance office and began receiving BAH with an effective date of 28 September 2010. Both the appellant and A1C JY continued to receive BAH until A1C JY separated from active duty on 14 May 2011. On 5 December 2011, the appellant returned to the finance office to update her status to reflect that her husband had separated from active duty. She then started to receive BAH at the increased "with dependent" rate. Additionally, she received back-dated "with dependent" rate BAH retroactively starting on the date A1C JY left active duty.

It is undisputed that on 28 September 2010, when the appellant and A1C JY were married, they had no intention of establishing a life as husband and wife. However, during the *Care*[1] inquiry, the appellant made various statements indicating that at some point after the marriage began they did attempt to live as husband and wife.

The military judge noted that she appeared to be qualifying her answers to his questions about the marriage, and he inquired further about it. The appellant reaffirmed that at the time of the marriage ceremony she did not intend to live as husband and wife with A1C JY. She said, however, that they "actually decided to give it a try" a "few days . . . a week, week and a half" after they were married because they had been living together and they "felt like [they] could make it work." In response to a question from the military judge, the appellant stated she thought she was really married and she and A1C JY acted like a married couple by doing the things married couples do. She said she and A1C JY would go out, share money, spend time together, and be intimate, "the things that anybody in a . . . committed relationship would do except for the fact that we were legally married."

---

[1] *United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

The court-martial recessed overnight. The next day, the military judge asked the appellant if she thought the marriage was a sham marriage. The appellant agreed it was a sham marriage. The military judge concluded the marriage was a sham, articulated his basis for doing so, and found the plea to larceny to be provident. He then entered findings of guilty in accordance with the appellant's pleas.

Despite the appellant's vacillation during the *Care* inquiry, we find nothing in the record before us, considered in its entirety, presenting a substantial basis in law or fact causing us to question the providence of the appellant's guilty plea. We hold that a marriage that is a sham at its inception remains a sham for purposes of acquiring housing allowances to which one or both parties to that sham marriage would not otherwise be entitled.

*Providency of the Plea*

We review a military judge's decision to accept a guilty plea for an abuse of discretion and review questions of law arising from the guilty plea de novo. *See United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). "In doing so, we apply the substantial basis test, looking at whether there is something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea." *Id.*; *see also United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991) (A plea of guilty should not be overturned as improvident unless the record reveals a substantial basis in law or fact to question the plea.).

"In reviewing the providence of Appellant's guilty pleas, we consider his colloquy with the military judge, as well any inferences that may reasonably be drawn from it." *United States v. Carr*, 65 M.J. 39, 41 (C.A.A.F. 2007) (citing *United States v. Hardeman*, 59 M.J. 389, 391 (C.A.A.F. 2004)). At trial, the military judge must (1) have ensured the appellant understood the facts supporting her guilty plea ("what" she did); (2) have ensured the appellant understood how the law applies to those facts ("why" she is guilty); and (3) be satisfied that the appellant is actually guilty. *See United States v. Medina*, 66 M.J. 21, 26 (C.A.A.F. 2008) (citing *Care*, 40 C.M.R. at 250-51); *United States v. Jordan*, 57 M.J. 236, 238 (C.A.A.F. 2002). A military judge abuses his discretion when accepting a plea if he does not ensure the accused provides an adequate factual basis to support the plea during the providency inquiry. *See United States v. Care*, 40 C.M.R. 247, 250-51 (C.M.A. 1969). This is an area in which the military judge is entitled to significant deference. *Inabinette*, 66 M.J. at 322.

*BAH as "Military Property"*

The appellant was charged with stealing military property in the form of BAH. BAH is "military property" of the United States. *United States v. Dailey*, 37 M.J. 463, 464 (C.M.A. 1993) ("[BAH] funds are appropriated by Congress; their defined purpose is

to boost morale and to ensure subsistence of servicemembers and their families. They are 'clearly distinguishable from salary' and, when improperly made, do not transform into the individual's property. These appropriated funds are surely military property." (citations omitted)).[2] Having reviewed the record and applied the appropriate legal tests as described above, we find no error in the military judge's conclusion as to the nature of BAH as military property.

*Nature and Legal Status of the Appellant's Marriage*

We reject the proposition that the appellant was ever in a valid marriage for purposes of being entitled to military benefits flowing from that marriage. Although the validity of a marriage is ordinarily a question of fact to be decided in accordance with state law, state law is not determinative where a service member enters into a sham marriage to fraudulently obtain government benefits or to commit immigration fraud. *Lutwak v. United States*, 344 U.S. 604, 611 (1953); *United States v. Bolden*, 28 M.J. 127, 130 (C.M.A. 1989). As noted in *Bolden*:

> Perhaps under that [state] law—which, according to accepted principles of conflict of laws, would govern the validity of the marriage—participation in a marriage ceremony is insufficient to create a valid marriage, if the parties never intended to live together as husband and wife. In that event, completion of the marriage ceremony clearly would not shield [the appellant] from conviction of larceny.

28 M.J. at 129.

We conclude that regardless of the legitimacy of her marriage under North Dakota law, the appellant was not entitled to use this marriage to claim housing allowance benefits.

In *Bolden*, our superior court upheld an appellant's conviction for conspiring to defraud the government out of housing allowance money by orchestrating a sham marriage between the appellant's friend, Bahre, and his girlfriend, Willoughby. *See Bolden*, 28 M.J. at 131. Although the history and living arrangements between Bahre and Willoughby differed from those between the appellant and A1C JY, the Court's overarching rationale for upholding Bolden's conviction is equally applicable to the case now before us. In both cases, the parties to the sham marriages undertook courses of conduct specifically intending—with singular focus—to gain access to government-funded payment streams to which they would not otherwise be lawfully entitled.

---

[2] Our holding to the contrary in *United States v. Thomas*, 31 M.J. 794 (A.F.C.M.R. 1990) is therefore overruled.

"Even if the marriage was valid under [state] law," our task would be to "inquire whether Congress intended for a servicemember to receive a quarters allowance as a married person if the marriage was a sham." *Bolden*, 28 M.J. at 129-30 (citing *Lutwak*, 344 U.S. at 605 (holding validity of marriage not determinative in case of servicemen convicted of engaging in sham marriages with non-citizens where purpose of marriages was to circumvent immigration laws)). In *Bolden*, our superior court noted it was "convinced that when Congress authorized a basic allowance for quarters for a servicemember with 'dependents,'" Congress "did not intend that the term include a person who was linked to a servicemember by only a sham marriage." *Id.* at 130. The Court further noted Congress "never intended to encourage or subsidize the sort of arrangement into which [Bahre and Willoughby] entered," and "there is nothing unfair in imposing criminal liability on a servicemember who seeks to obtain allowances from the Government by entering into a fake marriage." In light of *Lutwak*, the Court was "convinced that Congress meant to impose such liability." *Id.* at 130-131.

"The crucial issue in determining the legitimacy of a marriage is not the couple's way of life within the marriage but the spouses' intent at the time the marriage was contracted." Note, *The Constitutionality of the INS Sham Marriage Investigation Policy*, 99 HARV. L. REV. 1238, 1249 (1986). Under U.S. immigration law, a sham marriage is void from the start for purposes of securing residency status. In *Matter of Awwal*, the U.S. immigration service held that even in a case where the U.S. citizen stepparent of an alien stepson had demonstrated "active parental interest," the child enjoyed no advantageous immigration status customarily available to stepchildren because the father's original marriage to the boy's mother was a sham. 19 I. & N. Dec. 617, 619-21 (B.I.A. 1988). "A sham marriage is invalid from its inception." *Id.* at 621. *See also* 8 U.S.C. § 1325 ("Any individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws shall be imprisoned for not more than 5 years, or fined not more than $250,000, or both.").

Military law follows suit. In *Bolden*, the trial judge instructed the members:

> [A] sham marriage *is void under the law of this country as against public policy* and such a marriage can have no validity. Mutual consent is necessary to every contract and no matter what forms or ceremonies the parties go through indicating the contrary, they do not contract if they do not in fact assent. Marriage is no exception to this rule. If the spouses agree to a marriage only for the sake of representing it as such to the outside world, they have never really agreed to be married at all. They must assent to enter into the relation as it is ordinarily understood and it is not ordinarily understood as merely a pretense or a cover to deceive others.

*United States v. Bolden*, 23 M.J. 852, 854 (A.F.C.M.R. 1987) (emphasis added). Affirming our holding in *Bolden*, our superior court concluded that "the Government's

evidence was legally sufficient to sustain the findings of guilty and the instructions adequately informed the court members of the applicable legal principles." *Bolden*, 28 M.J. at 131.

In a later decision, our superior court expressly stated the test for determining whether a marriage is a sham entered into solely for the purpose of obtaining government benefits is whether "the two parties have undertaken to establish a life together and assume certain duties and obligations," as this is "the common understanding of a marriage." *United States v. Phillips*, 52 M.J. 268, 272 (C.A.A.F. 2000) (citing *Lutwak*, 344 U.S. at 611). This focus on the state of mind of the parties at the *inception* of the marriage is consistent with Congress' enactment of 37 U.S.C. § 423, which states:

> [P]ayment of an allowance, based on a purported marriage . . . before judicial annulment or termination of that marriage, is valid, if a court of competent jurisdiction adjudges or decrees that the marriage *was entered into in good faith* on the part of the spouse who is a member of a uniformed service or if, in the absence of such a judgment or decree, such a finding of good faith is made by the Secretary concerned or by a person designated by him to investigate the matter.

(emphasis added). Through this statute, Congress is electing not to recoup from a military member allowances which were paid to her when she entered into a marriage in good faith but where that marriage was later found to be invalid.[3] *Bolden*, 28 M.J. at 130 ("Congress did not intend to impose criminal liability on persons who had failed to satisfy technical legal requirements but were living together as husband and wife in a good faith belief that they were married . . . ."). In contrast, if a determination is made (by a court or a military service Secretary) that the marriage was entered into in bad faith, the military member would not be entitled to keep the money previously paid to her.

---

[3] The Department of Defense has implemented this provision via regulations. "A member's lawful spouse . . . [is] always [a] dependent[] for housing allowances purposes," but "[a]ny case in which the validity of a member's marriage is questioned is a case of doubtful relationship." Joint Federal Travel Regulation, Vol. 1, Uniformed Service Members, ¶¶ U10102, U10104 (1 October 2009). Some circumstances are listed where the Department will (and will not) recognize marriages as valid for housing allowances purposes (common law marriages, foreign nation divorces, etc.). *Id.* ¶ U10104. Under "Purported Marriage," it notes that a member with "no lawful spouse" due to a void marriage cannot receive a housing allowance at the dependent rate. *Id.* Upon discovery of the marriage invalidity (a listed example being a spouse who already had a preexisting marriage), the housing allowances must stop but the member may retain payments already received if they are "validated" by a process through which a "determination on the validity of a marriage (doubtful cases) or for validation of [past] payments" is made. Within that process, payments of allowances based on a "purported marriage . . . are valid if . . . [a] court of competent jurisdiction adjudges or decrees that the military member *entered the marriage in good faith*," or, in the absence of such a decree, "a finding of good faith is made by the Secretary of the Military Service" or his/her designee. Department of Defense Financial Management Regulation, Vol. 7A, Ch. 50, ¶ 500601 (July 2006) (emphasis added). "Payments based on invalid marriages are considered erroneous payments or overpayments unless validated." *Id.* ¶ 500603.

Others skeptical of the position we take today may posit that people can get married for a variety of reasons. For example, some marry to gain approval of a family member, or to share in raising a child. "In an era of two-career relationships, the timing of marriage and the nature of marital living arrangements may be heavily influenced by such unromantic factors as tax laws, occupational benefits, and professional opportunities." *Phillips*, 52 M.J. at 273 (Effron, J., dissenting). Who is to say what is a "sham" or an "invalid" reason for marriage? Congress. In enacting the authorization for housing allowance, Congress answered the question about who is authorized to receive funds from the government to provide for a dependent. *See Bolden*, 28 M.J. at 130. What we hold today is simply this: It is not the absence of a perfect or ideal "love, honor, and cherish" motivation of the parties that renders the consequences flowing from the appellant's actions in the case before us criminal; rather, it is the affirmative presence of a singularly focused illicit one—an intent to fraudulently acquire a government payment stream—that does so.

Because we find her marriage to be void for housing allowance purposes from the outset, we do not find any relevance in the appellant's decision to "make a go" of her marriage or in her described behavior after the date of her marriage ceremony. She admitted entering into the marriage in bad faith and therefore she is not entitled to the housing allowance benefit Congress intended to support legitimate spouses and other valid dependents of military personnel.

Though the appellant attempted to recast her actions in as favorable a light as possible during the *Care* inquiry by initially equivocating on various points, the military judge pressed where he needed to and in so doing established the following facts, which we find sufficient to leave her guilty plea undisturbed. In light of these facts, we uphold the military judge's decision that the appellant's plea was not invalidated by her asserted belief that within "a few days . . . a week, a week and a half" the appellant thought she was legally married, that they acted like husband and wife, that she believed she was married, and that she conducted herself as though she was married. The military judge recognized the appellant described a matter that may be inconsistent with her plea. Subsequently, he conducted additional inquiry such as to clarify the appellant's admission she was not entitled to the money, and only acquired possession of the funds under false pretenses with a criminal state of mind. As the appellant explained:

> I deceived the Air Force because when me and [A1C JY] initially got married, we did not establish—or we did not intend to establish a marital life together. And when I went back in December to the Finance office to get BAH with-dependent rate, we had not established a life together at that point.

The appellant admitted she entered into the marriage ceremony in bad faith, clarifying, "[W]e got married just to be able to stay off base. It wasn't for me and him to

establish a life together when we first got married." The appellant further explained, "At the time when we did initially—or when we got married, it wasn't under good faith or for the reason of binding two people as one in a marriage." The appellant also admitted, "[W]e got the marriage certificate under false pretenses."

Prior to the sham marriage, the appellant lived with SrA NK, who was her then current girlfriend, and with A1C JY, whom she had previously dated. The appellant spent some nights in A1C JY's room and other nights in SrA NK's room. There is no indication the marriage in any way altered the sleeping arrangements or relationships among the roommates. Quite to the contrary, by early February 2011 A1C JY had moved out, and the appellant and SrA NK moved into a rented house together along with another roommate. Notably, also in February 2011, the appellant threatened SrA NK with a loaded gun because of concerns that SrA NK had cheated on her. On these facts, we do not agree that the appellant believed she and A1C JY "lived together as husband and wife." *See Phillips*, 52 M.J. at 272 (observing that evidence of a spouse's romantic relationships with others "made it more probable that [the married couple] intended to continue their separate lives and relationships" where those relationships existed before and continued after the marriage).

As to sharing money, the appellant offered no specifics except that, after A1C JY moved out, "When he would call and tell me he needed money, I would give it to him." When asked why she provided money to A1C JY when he would call and ask for it, she answered, "Because he needed it, and I've always been there for him to help him out, whatever he needed." When the judge asked her to specify whether she was required to support him because they were married or for some other reason, she answered, "Well, I was required to provide him support, *but it was because he—me and him are really, really close, sir*." Nothing about her statement suggests her decision to occasionally "help out" A1C JY financially was part of "establish[ing] a life together and assum[ing] certain duties and obligations," *see Phillips*, 52 M.J. at 272, or that she did so because she was lawfully responsible for A1C JY as her spouse.

She did not say she and A1C JY shared bills, split grocery or other living expenses, paid taxes as a married couple, or in any way meaningfully managed their finances as married couples customarily do. Rather, she offered nothing beyond broad generalities constituting little more than what appears to be an effort to minimize her misconduct in the eyes of others present in the courtroom.

Considering the entire record before us, including this appellant's demonstrated propensity to attempt to shape the evidence as favorably as possible to her advantage,[4]

---

[4] The appellant was also convicted of wrongfully endeavoring to influence Senior Airman (SrA) NK's testimony as a witness during the appellant's Article 32, UCMJ, 10 U.S.C. § 832, investigation by, *inter alia*, providing SrA NK with a handwritten list of things she should tell the investigating officer regarding the nature of their relationship and when it started.

and in light of the discretion accorded to a military judge when evaluating the providence of an accused's guilty plea, we find nothing in the appellant's meandering, off again–on again statements during the *Care* inquiry to reveal a substantial basis in law or fact sufficient to cause us to question the plea. *See Inabinette*, 66 M.J. at 322. Rather, those statements reflect the reality Judge Cox observed in *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996) (quoting *United States v. Penister*, 25 M.J. 148, 153 (C.M.A. 1987) (Cox, J., concurring)):

> Often an accused is reluctant to admit to a particular aspect of an offense. However, that should not vitiate his guilty plea if he recognizes that the evidence against him will prove the point, and he admits his guilt to the offense.

> We should not overlook human nature as we go about the business of justice. One aspect of human beings is that we rationalize our behavior and, although sometimes the rationalization is "inconsistent with the plea," more often than not it is an effort by the accused to justify his misbehavior.

> A good trial judge can usually sort out the guilty plea and determine if an accused is so pleading because he has committed the offense charged.

In the case before us, we believe the trial judge effectively sorted out the appellant's narrative and appropriately accepted her guilty plea. Accordingly, as to the Specification of Charge IV, we find the military judge did not abuse his discretion by accepting the appellant's plea of guilt.

*Conclusion*

The approved findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the appellant occurred.[5] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

---

[5] This Court's initial decision was issued on 11 April 2014, but due to our grant of reconsideration en banc more than 540 total days have elapsed since the case was first docketed with us. *See United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Assuming the total appellate processing of this case raises a presumption of unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. We find that the appellate delay in this case was harmless beyond a reasonable doubt. *See Moreno*, 63 M.J. at 135-36; s*ee also United States v. Harvey*, 64 M.J. 13, 24 (C.A.A.F. 2006). We are cognizant of our ability to provide relief in the absence of prejudice but decline to do so in this case. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002).

Accordingly, the approved findings and sentence are

AFFIRMED.

Senior Judge MARKSTEINER participated in this decision and authored the opinion of the Court prior to his reassignment. Judge TELLER was not a member of the Court when it reconsidered this case en banc and did not participate.

WEBER, Judge, concurring:

I fully concur with the Court's opinion detailing the reasoning behind "sham marriage" cases. I also agree with the opinion that the appellant did not call into question the providency of her plea by stating that, after the sham marriage began, she and her co-conspirator made some attempt to "give it a try." I write separately simply to stress that a military judge enjoys "broad discretion" in deciding to accept a guilty plea, and this decision will not be overturned unless the record as a whole shows "a substantial basis in law and fact for questioning the guilty plea." *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008) (quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)) (internal quotation marks omitted).

The appellant clearly and repeatedly admitted that she entered into the "marriage" for the sole purpose of defrauding the U.S. Government out of housing allowances. Her providency inquiry revealed that throughout most if not all of the charged time frame, the appellant and her "husband" were not living together as husband and wife in any true sense of the phrase. The military judge recognized that the appellant's statements about what occurred after the sham marriage commenced raised some issue that required further exploration. He thoroughly and methodically explored this issue, giving the appellant plenty of time to discuss this matter with her defense counsel. Time and again, the appellant reiterated that she understood the issue raised by her statements, repeated that she was guilty because her intent was to defraud the government out of housing allowances through a sham marriage, and reiterated her desire to plead guilty. The military judge did exactly what he should have, and there is no "substantial basis" for questioning the plea. Given the significant deference he enjoys in deciding whether to accept a guilty plea, I would end the analysis there.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

11