# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**M.D. MODZELEWSKI, R.Q. WARD, J.R. MCFARLANE**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**STEPHEN P. HOWELL**
**STAFF SERGEANT (E-6), U.S. MARINE CORPS**

**NMCCA 201200264**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 12 October 2012.
**Military Judges:** 8 January 2012 to 14 June 2012 Sessions,
LtCol R.G. Palmer, USMC; 20 August 2012 Session, Col D.J.
Daugherty, USMC; 9-12 October 2012 Sessions, Col G.W.
Riggs, USMC.
**Convening Authority:** Commanding General, Marine Corps
Recruit Depot/Eastern Recruiting Region, Parris Island, SC.
**Staff Judge Advocate's Recommendation:** Maj S.D. Manning,
USMC.
**For Appellant:** C. Ed Massey, Esq.; LCDR Ryan Mattina, JAGC,
USN.
**For Appellee:** Maj Paul Ervasti, USMC; Capt Matthew Harris,
USMC.

**22 May 2014**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

MODZELEWSKI, Chief Judge:

A panel of members with enlisted representation sitting as a general court-martial convicted the appellant, contrary to his pleas, of violating a lawful general regulation, rape, aggravated sexual contact, forcible sodomy, assault consummated by battery, and adultery in violation of Articles 92, 120, 125,

128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 920, 925, 928, and 934.  The panel sentenced the appellant to eighteen years of confinement, reduction to pay grade E-1, forfeiture of all pay and allowances, and a dishonorable discharge, and the convening authority (CA) approved the adjudged sentence.

The appellant assigns three errors: that the guilty findings under Articles 120, 125, and 128 were legally and factually insufficient; that the military judge plainly erred in providing the members a transcript to refresh their recollection after a four-month hiatus in the trial, rather than replaying a recording of the prior testimony; and, that the military judge's remedy for unlawful command influence (UCI) arising from the Commandant of the Marine Corps' Heritage Brief was inadequate.

Having considered the parties' pleadings and the record of trial, we hold that the appellant has raised some evidence of an appearance of UCI.  We further hold that the Government has not demonstrated beyond a reasonable doubt that the appearance of UCI did not affect the findings or the sentence.  Accordingly, we set aside the findings of guilt and the sentence, with a rehearing permitted.[1]  Arts. 59(a) and 66(c), UCMJ.

## I.  Background

The procedural timeline to this case is tortuous, but central to the resolution of the issue of UCI, and so is provided in detail.  Because of the interplay between the Heritage Brief tour and the timeline of this case, we begin with the Heritage Brief itself.

## A.  The Heritage Brief

In April 2012, General James F. Amos, the Commandant of the Marine Corps (CMC), and Sergeant Major Michael P. Barrett, the Sergeant Major of the Marine Corps (SMMC), embarked on a tour of all major Marine Corps installations, as well as a few other locations where Marines were stationed, to deliver a lecture that came to be known as the Heritage Brief.  The CMC's target audience for the Heritage Brief was "every single staff NCO and officer in the Marine Corps."[2]  The tour began in Florida on 2

---

[1] We find the first assigned error to be without merit and that our resolution of the third assigned error makes the second moot.

[2] Appellate Exhibit LXXXVI at 1.

April 2012 and concluded in New Orleans on 24 July 2012.[3]  With some minor variance, the CMC and SMMC visited the East Coast installations in April, the West Coast in May, and the overseas installations in June.[4]

On 19 April 2012, the CMC and the SMMC presented the Heritage Brief at Marine Corps Recruiting Depot Parris Island, SC., where the appellant was pending trial by general court-martial.  His trial was docketed for the week of 11 June 2012, and the standing convening order had been modified specifically for the appellant's court-martial on 23 March 2012.  Of the eleven members listed on the convening order for the appellant's trial, eight members were present in the audience for the Heritage Brief on 19 April 2012, which was video-recorded and later transcribed.

The CMC's brief lasted slightly over an hour; he began by saying, "we are family here and like dad we need to talk because we need to straighten a few things out."[5]  Initially, General Amos spoke about how he prepared to assume the role of CMC, his priorities as CMC, and his responsibility for the "spiritual health of the Corps."[6]  For the remainder of the brief, the CMC addressed trends and specific episodes that he viewed as adversely affecting the Corps' spiritual health.

First, the CMC highlighted media coverage of incidents of indiscipline in theater and a high-visibility allegation of hazing, and discussed how those incidents and the media coverage reflected poorly on the Marine Corps.[7]

## 1.  General Remarks About Sexual Assault

The CMC then turned to media coverage of sexual assault within the Marine Corps, starting with allegations arising at the Marine Barracks in Washington, D.C.  Noting that Congress was "livid" about such incidents, General Amos informed the audience that there were five bills pending in Congress related to military justice, one of which proposed to remove CAs from the sexual assault referral process because "they have no

---

[3] AE CXXVIII at 1-2.

[4] *Id.*

[5] AE LXXXVI at 2.

[6] *Id.* at 2-7.

[7] *Id*. at 8-9.

confidence in our ability or willingness to do anything about (sexual assaults) ourselves."[8]  The CMC described that bill as wresting control from commanders and giving it to the Department of Justice.  General Amos also discussed a breakfast meeting at his home the prior day, at which he hosted four members of Congress along with general officers, female officers, and the SMMC.  The CMC stated that two Congressmen abruptly left the breakfast meeting after complaining that they didn't trust the Marine Corps to fix the problem of sexual assault.[9]  The CMC recounted a particularly tense conversation between himself and one of the Congressmen about a particular sexual assault case.  The CMC related to the audience that he told the Congressman, "I am the Commandant of the Marine Corps and I am telling you we are going to fix it.  I'm sick of it and we are fixing it."[10]

The CMC also told an anecdote about two female Marines, one a "(g)reat young female Captain" and one "a female Master Sergeant unbelievable, sharp -- unbelievable," who both told him that they had "'been sexually assaulted at every rank [they had] held.'"  He repeated their statement and then said, "We are going to fix it, Marines.  I need your help with this.  I am done."[11]

### 2.  Specific Comments Regarding Sexual Assault

As the CMC discussed the problem of sexual assault within the Marine Corps, his comments included the following:

> [W]e had 348 sexual assaults in 2011 and you go -- males in here, I know exactly what you are thinking, well . . . it's not true; it is buyer's remorse; they got a little liquored up and got in the rack with corporal, woke up the next morning, pants were down, what the hell happened; buyer's remorse.  Bull shit. I know fact.  I know fact from fiction.  The fact of the matter is, 80 percent of those are legitimate sexual assault.[12]

---

[8] *Id*. at 10-11.

[9] *Id*. at 16.

[10] *Id*. at 11-12.

[11] *Id.* at 15-16.

[12] *Id.* at 12-13.

4

. . . .

So let's do Math for Marines for a second. I said that we had 348 sexual assaults that were reported last year. Across the Nation, the experts -- I am not talking about the experts that you don't care about, I am talking about experts that would have credibility with everybody in this auditorium -- say that sexual assault is under reported by a factor of at least two, it could be three or four. I personally believe it is at least two . . . could very well be three times.[13]

. . . .

I am not happy with [the problem of sexual assaults in the Marine Corps]. It is a scar on the United States Marine Corps. I'm ashamed of it. And I am going to convince you that it's real. That is my job. . . . And if you do not believe in the statistics, just hang with me, because I am going to make a believer out of you because it is real.[14]

### 3. Specific Comments Regarding Accountability

Following these remarks about sexual assault, the CMC immediately segued into the topic of accountability:

(W)e have got a problem with accountability. I see it across the Marine Corps. I see it in the Boards of Inquiry, in their results and we have got an officer that has done something that is absolutely disgraceful and heinous and the board . . . he goes to a court-martial and he goes before a board of colonels and we elect to retain him. Why? Do I need this captain? Do I need this major? I don't. Why would I want to retain someone like that? I see the same thing with staff NCOs. You go before a board and the board sits around through milk of human kindness and misguided loyalty and says this is a good staff sergeant, this is a good gunny, he has got 17 years in, never mind the fact that he was sleeping with a corporal and he is married, we already took him, we have already hammered him, he has a letter of reprimand, let's keep him. Why? There is a lack of accountability that

---

[13] *Id.* at 13.

[14] *Id.* at 15.

just befuddles me with the commanding officers and the senior enlisted in the Marine Corps. And I will tell you that. I am very, very disappointed.

I see this stuff in courts-martial, I see it in the behavior and just for the life of me I can't figure out why we have become so ecumenical, why we have become so soft? Where are we going [to] keep a sergeant that absolutely does not belong in the United States Marine Corps. Why would we need to do that? And the answer is we don't.

. . . .

And I want the Staff NCOs in here and I want the officers in here, the commanding officers, and the sergeants major to take a hard look at how we are doing business. If you have a Marine that is not acting right, you've got a Marine that deserves to leave the Corps, then get rid of them; it is as simple as that.[15]

The CMC then concluded his brief by discussing the special value that the American public places on the Marine Corps and enjoining the audience to help him "fix" this "family business."[16]

## B. The White Letters

The CMC issued two "White Letters" in conjunction with his Heritage Brief tour.

**1. White Letter 2-12**: One month into the tour, the CMC issued White Letter No 2-12, with the subject line "Sexual Assault."[17] The three-page letter was dated 3 May 2012 and addressed to "All Marines." The CMC's message in White Letter 2-12 can be summarized as follows: sexual assault is a crime; many Marines fail to acknowledge the scope and seriousness of the issue; the CMC expects leadership to be engaged; and he has convened a group of senior Marines to design a Corps-wide campaign to address the issue. Underneath his signature, the

---

[15] *Id.* at 17-18.

[16] *Id.* at 22.

[17] AE LVII at 11.

6

CMC hand-wrote: "Marines . . . leaders . . . I need your immediate attention to this matter!"[18]

**2. White Letter 3-12:** On 12 July 2012, the CMC issued White Letter 3-12.[19] That letter can fairly be read as a curative measure. Entitled "Leadership," White Letter 3-12 was addressed to general officers, commanding officers, officers-in-charge, and E-9s. In pertinent part, the letter states:

> While the (Heritage Brief lectures) express my strong feelings about "*getting the Corps back on a heading of True North*," I am not directing or suggesting specific administrative or military justice actions be taken absent compliance with established law. My intent is not to influence the outcome or response in any particular case, but rather to positively influence the behavior of our Marines across our Corps. As senior leaders, we have the inherent responsibility to ensure the sanctity of our justice system, this includes the presumption of innocence unless otherwise proven.[20]
>
> . . . .
>
> Next, the matter of whether or not a Marine committed a sexual assault and what should happen, will be determined based on the facts presented. I expect all Marines involved in the military justice process -- from convening authorities, to members, to witnesses -- to make their own independent assessment of the facts and circumstances of each case.[21]

## C. Media Coverage

The Heritage Brief and White Letter 2-12 garnered significant media attention and coverage. Beginning in early May 2012, the Marine Corps Times closely covered the CMC's tour and remarks, frequently featuring the story on its front cover. The appellant's trial began on 11 June 2012; the Times edition for that week reported on General Amos's visit and Heritage

---

[18] *Id*. at 11-13.

[19] AE CXXX.

[20] *Id*. at 1.

[21] *Id.* at 2.

7

Brief at Marine Barracks Washington in late May.[22]  The
Commandant's tour also attracted the attention of mainstream
media: USA Today profiled the Commandant and his tour on 5 June
2012, one week prior to the appellant's trial.[23]

## II.  The Timeline of This Case

### A.  Arraignment and Initial Article 39(a) Sessions

The appellant was arraigned on 6 January 2012 and requested
trial by members with enlisted representation.  By Case
Management Order (CMO) dated 15 February 2012, the military
judge, Lieutenant Colonel (LtCol) R.G. Palmer, USMC, docketed
the case for trial the week of 2-6 April 12.[24]  On 23 March 2012,
the CA modified the original convening order specifically for
the appellant's trial, changing nearly the entire venire and
including enlisted representation.  On 25 March 2012, the court
held an Article 39(a), UCMJ, session to litigate numerous
defense motions.  At that motions session, the parties clearly
were anticipating trial the following week, in accordance with
the CMO.  For reasons not apparent in the record, the
appellant's case did not proceed to trial the following week.
Instead, the record picks up with another Article 39(a) session
held on 1 June 2012, with all parties now clearly preparing for
trial the week of 11 June 2012.  The record contains no
reference to, much less explanation for, the ten-week delay.

### B.  UCI Motion and Initial Ruling

During that delay, however, the CMC and SMMC presented the
Heritage Brief at Parris Island, as discussed *supra,* and the
defense filed a motion for appropriate relief on 26 May 2012
alleging UCI arising from that 19 April 2012 brief.[25]  At the
Article 39(a) session held on 1 June 2012, the military judge
(LtCol Palmer) briefly discussed the UCI motion, noting that he
had not attended the Heritage Brief because of his judicial
position and had not read any of the extensive media coverage of
the CMC's tour.[26]  At that time, the defense counsel informed him
that the evidence in support of the UCI motion was attached to

---

[22] AE LXXXVIII.

[23] AE LXXXVII.

[24] AE LV.

[25] AE LVII.

[26] Record at 297-98.

the motion.[27]  The attachments included video and audio recordings of the Parris Island brief, and numerous print media articles covering the CMC's tour.  LtCol Palmer assured the parties that he would review the material prior to the next session of court on 11 June 2012.

On 11 June 2012, the parties litigated the UCI motion.  The defense played the recording of the full Heritage Brief and offered testimony from a senior noncommissioned officer who attended the brief.  After argument on the motion, LtCol Palmer denied the defense motion to dismiss, finding that the defense had not met its initial burden of showing some evidence of UCI and a connection between any UCI and the case at trial.[28]  In light of that finding, he granted no remedies, although he noted that he would allow broad *voir dire*.

On 12 June 2014, prior to the arrival of the members, the defense counsel gave notice that they would seek a writ from this court based upon the military judge's ruling on the UCI motion, and requested a continuance.[29]  The military judge denied the motion for a continuance and assembled the eleven members of the venire.

## C.  *Voir Dire* on the Heritage Brief

The members were all questioned extensively about the Heritage Brief, White Letter 2-12, and the media coverage of both.  Individual *voir dire* revealed the following: eight of the eleven members attended the Heritage Brief; many had also either read White Letter 2-12 or the media coverage; virtually all acknowledged a high degree of deference to the CMC, particularly when he holds a strong opinion on a topic; they recalled the Heritage Brief primarily focusing on two things – sexual assault and accountability; almost all remembered and accepted as true the CMC's statement that 80% of sexual assault allegations are legitimate; and, most would characterize the CMC as unhappy, frustrated, or disappointed in his officers and senior enlisted for their failure to hold Marines accountable.

We turn to particular responses that convey the flavor of the *voir dire* responses from the panel.  Two members were particularly frank in their responses.  They each opined that, although they could remain fair and impartial, they believed

---

[27] *Id*. at 315.

[28] *Id*. at 471; AE CXIV at 20.

[29] Record at 472-73.

other Marines sitting as panel members might be swayed by the CMC's remarks either to find an accused guilty or to punish him with a punitive discharge. LtCol M stated, "I can see where someone after the White Letter and if they sat in that meeting they could see where there is some pressure. And the Commandant says he's not happy with something; I can see where some people would feel some pressure to do something . . . I don't want to say their judgment is clouded but they could feel some pressure to think one certain way."[30] LtCol M then characterized a possible reaction by a panel member as "[I]f it's close, I'm on the fence, I'm going to go with the Commandant."[31]

LtCol B also asserted his own independence, but conceded that "I think it's entirely possible that some people could have been (influenced to give punitive discharges based on what the CMC said)."[32] Both of these members referenced conversations among fellow officers following the Heritage Brief: LtCol M referenced conversations in which officers spoke about "undue influence."[33]

Master Gunnery Sergeant (MGySgt) P, when asked about the CMC's statement that 80 percent of sexual assault allegations are legitimate, responded, "I believe that . . . that's his opinion that 80 percent are true. I don't take it to mean though that the other twenty percent are made up."[34] She also acknowledged that the CMC's remarks may have "some bearing" in her decision-making as a panel member.[35]

Master Sergeant (MSgt) H, when asked about the same remark from the CMC, responded, "Like I said, ma'am, I would think highly that he has (done) his homework and that he's been advised correctly."[36] Later, in response to a similar question, MSgt H replied, "[L]ike I said, he has knowledge of those things. So if he said it happens, it happens."[37]

---

[30] *Id.* at 571.

[31] *Id.* at 572.

[32] *Id.* at 586.

[33] *Id.* at 566.

[34] *Id.* at 632.

[35] *Id.* at 634.

[36] *Id.* at 663.

[37] *Id.* at 665.

When asked what message the CMC conveyed in the Heritage Brief, First Sergeant (1stSgt) W summed it up as follows: "Basically . . . that senior enlisted and senior officers, we're not doing our jobs as far as keeping the Marines in line. He's tired of the sexual assaults/sexual misconduct amongst officers and Staff NCOs, and he's holding us accountable."[38] This same member later engaged in the following exchange with the trial counsel:

> Q.   Do you feel . . . based on what the Commandant said that you would be expected to find the accused guilty?
> A:   If the evidence was there, yes, sir.
>
> Q:   Okay, and what if the evidence wasn't there?
> A:   Then I'd have to dig deeper.[39]

## D.   Challenges

The Government successfully challenged two members for cause: LtCol M, explicitly on the basis of his responses to questions concerning the Heritage Brief and its aftermath, and 1stSgt W, for issues of impartiality. The defense then challenged all members for cause on the basis of UCI and then followed up with specific points raised from each member's *voir dire*; upon reviewing the specifics of each challenge, LtCol Palmer granted only two, Captain D and Gunnery Sergeant B, both for responses concerning the effect of the CMC's remarks. Additionally, LtCol Palmer granted a defense challenge of a member who had herself been the victim of a sexual assault. The defense then exercised its peremptory challenge. Of note, the defense was forced to use its peremptory challenge against MSgt H, whose comments are noted above, as LtCol Palmer denied that challenge for cause. In total, three members were excused for cause due to their responses concerning the Heritage Brief.

## E.   Final Panel

At the end of a full day of *voir dire*, a panel of five remained: Colonel (Col) K, LtCol B, Major (Maj) Y, MGySgt P, and 1stSgt T. All but Maj Y had attended the Heritage Brief, two explicitly stated their acceptance of the 80% statistic quoted by the CMC, and all five had been unsuccessfully challenged by the defense.

---

[38] *Id*. at 678.

[39] *Id*. at 673-74.

**F.  Renewal of the UCI Motion**

The following morning, 13 June 2012, the civilian defense counsel renewed the UCI motion, arguing that the responses by members regarding the Heritage Brief clearly established some evidence of UCI, shifting the burden to the Government.[40]  LtCol Palmer again denied the motion, finding no actual or apparent UCI, without reference to whether the defense had met its initial burden of producing some evidence of UCI.[41] Additionally, and inexplicably, he noted that "for the most part, the purposes for or the reasons for excusal of the members had nothing to do with their participation in the Commandant's speech or anything having to do with the UCI issue."[42]  He also denied the defense's renewed request for a continuance pending a decision by this court on a defense intended petition for extraordinary relief and a stay of proceedings.

**G.  Case Begins and Stay Granted**

The Government began its case-in-chief with a day of testimony by the victim.  The following day, 14 June 2014, this court issued a stay, and the trial immediately ceased during the Government's examination of its second witness.

**H.  LtCol Palmer's PME Lecture**

One week later, while the stay remained in effect, LtCol Palmer was asked to present a Professional Military Education (PME) lecture to five junior officers known as "summer funners," student judge advocates performing active duty special work during the summer break from law school.  In his lecture, LtCol Palmer spoke at length about the responsibilities of trial counsel and for a shorter period of time about defense counsel duties.  Two of the officers who attended the PME provided written statements shortly after the session.[43]  One of these two junior officers noted that he found some of the comments "odd and somewhat bothersome," but also believed some of the comments were meant to be humorous.[44]  The other officer did not opine as

---

[40] Record at 748–49.

[41] *Id.* at 750.

[42] *Id.*

[43] AE CXXIV at 7–10.

[44] *Id.* at 7-8.

to whether any of the comments were made in jest, but simply recited them.[45]

Reading these two statements in tandem, it appears that LtCol Palmer was urging these prospective judge advocates to be aggressive when assigned as trial counsel in charging and prosecuting their cases.  Adopting a very informal or colloquial manner of speaking, LtCol Palmer referred to panel members in disparaging terms, calling them "knuckle-draggers" and "morons." He also spoke disparagingly of accused at courts-martial. Speaking to the junior officers as prospective trial counsel, LtCol Palmer made the following comments:  "The defendant is guilty.  We wouldn't be at this stage if he wasn't guilty.  It is your job to prove he is guilty.  You need to take him down."[46]

Moreover, despite being under a recent stay of proceedings by this court over his ruling on the defense UCI motion, LtCol Palmer appeared to relate to his audience many of the concerns articulated by the defense in their motion.  Specifically, he told the junior officers that Congress was "mad" at the Marine Corps over its handling of criminal cases and that Congress wanted "more convictions."[47]

## I.  Motion to Recuse and Reassignment

LtCol Palmer's comments during that PME lecture quickly became a source of considerable controversy and litigation.  The following week, defense counsel in *United States v. Bremer* requested that he recuse himself for lack of impartiality, and LtCol Palmer presided over a lengthy Article 39(a) session that explored the content and tone of his PME lecture.[48]  Although he denied the recusal motion in *Bremer,* LtCol Palmer shortly thereafter requested reassignment and left the trial bench.

## J.  Motion to Withdraw Petition for Extraordinary Relief

On 18 July 2012, Col D.J. Daugherty, USMC, the Chief Judge of the Navy-Marine Corps Trial Judiciary, presided over the

---

[45] *Id.* at 9.

[46] *Id*. at 9.

[47] *Id*. at 8, 9.

[48] AE CXXXIV.  *See United States v. Bremer*, 72 M.J. 624 (N.M.Ct.Crim.App. 2013) (finding that the judge erred in not recusing himself and remanding for resentencing).

unrelated case of *United States v. Jiles*,[49] heard the same UCI motion regarding the Heritage Brief, found apparent UCI, and granted significant remedies. In the wake of LtCol Palmer's departure from the trial bench and Col Daugherty's ruling in *Jiles*, the appellant's defense team moved on 20 July 2012 to withdraw its petition for extraordinary relief from appellate review, which motion was granted by this court on 23 July 2012. Although not entirely clear from the record, it appears that the defense withdrew its petition based on an assumption that Col Daugherty would reconsider all defense motions litigated to that point in the trial.

## K. Reconsideration of UCI Motion

On 20 August 2012, Col Daugherty presided over an Article 39(a) session at which he granted a motion to reconsider all previously decided defense motions, including the UCI motion.[50] As new evidence on the UCI motion, the defense presented the affidavits from the summer judge advocates who attended the PME lecture and the transcript from the *Bremer* Article 39(a) hearing, arguing that LtCol Palmer's PME remarks revealed a bias and the appearance of a taint from the Heritage Brief. Col Daugherty raised the possibility of any number of curative measures to include mistrial; however civilian defense counsel specifically eschewed mistrial as a remedy. Instead, he argued for dismissal with prejudice as the most appropriate remedy, but alternatively suggested either a cap on confinement or removal of a punitive discharge as an authorized punishment.[51]

On 11 September 2012, Col Daugherty released his written ruling on the UCI motion.[52] He identified specific portions of the Heritage Brief that "arguably could raise the appearance of UCI."[53] Col Daugherty reversed LtCol Palmer's initial ruling and found that the defense had met its initial burden of raising the issue of UCI by showing some evidence that bore a logical connection to the charges and specifications in the court

---

[49] No. 201200062, 2014 CCA LEXIS 151, unpublished op. (N.M.Ct.Crim.App. 6 Mar 2014).

[50] Record at 1187.

[51] *Id.* at 1175-76, 1218-19.

[52] AE CXLV.

[53] *Id.* at 19.

martial.[54]  However, Col Daugherty then concluded, beyond a reasonable doubt, "that the voir dire, the liberal granting of challenges by Judge Palmer and the remedial actions taken, the passage of time, and the availability of all favorable defense witnesses have removed any taint of UCI or prejudice at this point in the trial."[55]  In conclusion, Col Daugherty suggested that "upon resuming trial, the new trial judge may pose additional questions to the members and may publish the appropriate portions of CMC White Letter 3-12 as an additional remedial measure . . . to determine if there is any residual taint still present in the members of the panel . . . from the Heritage Brief."[56]

**L.  The Trial Continues**

On 9 October 2012, trial resumed with yet another military judge presiding, Col G.W. Riggs, USMC.  Although Col Riggs conducted a brief inquiry into whether the members had attended any Sexual Assault Prevention and Response training during the four-month hiatus, he asked them no other questions.  Most notably, he neither asked the members whether they had read White Letter 3-12, nor published the document to them.  Later that week, the members convicted the appellant of all charged offenses[57] and sentenced him to eighteen years' confinement, a dishonorable discharge, total forfeitures, and reduction to pay grade E-1.

### III.  The Law Regarding Unlawful Command Influence

Article 37, UCMJ, states "No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof . . . ."  10 U.S.C. § 837 (2006).

We review allegations of UCI *de novo*.  *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citing *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006)).  Because of the peculiar procedural history of the UCI issue in this case, we highlight below both the trial and appellate standards for

---

[54] *Id.* at 23-24.

[55] *Id.* at 25-26.

[56] *Id.* at 26.

[57] Other than offenses charged as lesser included offenses.

review of allegations of UCI, as our *de novo* analysis and decision are informed by the manner in which these allegations of UCI were decided when raised at three junctures during the trial.[58]

The defense has the initial burden of raising the issue of UCI, whether at trial or on appeal. When raising UCI at the trial level, the defense is required to present "some evidence" of UCI. That is, the defense must "show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *United States v. Biagase,* 50 M.J. 143, 150 (C.A.A.F. 1999) (citations omitted).

On appeal, the appellant bears the initial burden of showing: (1) facts that, if true, constitute UCI; (2) that the proceedings were unfair; and (3) that the UCI was the cause of the unfairness. *Salyer*, 72 M.J. at 423 (citing *United States v. Richter,* 51 M.J. 213, 224 (C.A.A.F. 1999)). "Thus, the initial burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002). As at trial, the quantum of evidence required on appeal to raise UCI is "some evidence." *Salyer*, 72 M.J. at 423 (citation and internal quotation marks omitted).

Once the appellant makes this initial showing, whether at trial or on appeal, the burden shifts to the Government. To meet this burden, the Government must prove, beyond a reasonable doubt: (1) that the predicate facts do not exist; or (2) that the facts do not constitute UCI; or (3) that the UCI will not prejudice the proceedings or did not affect the findings and sentence. *Biagase*, 50 M.J. at 151. "[O]nce unlawful command influence is raised at the trial level, as it was here, a presumption of prejudice is created. *United States v. Douglas*, 68 M.J. 349, 354 (C.A.A.F. 2010) (citing *Biagase*, 50 M.J. at 150). "To affirm in such a situation, we must be convinced beyond a reasonable doubt that the unlawful command influence

---

[58] The appellant contends that Col Daugherty abused his discretion in crafting inadequate remedies of additional *voir dire* and publication of curative White Letter 3-12. In fact, Col Daugherty granted no remedies, having concluded beyond a reasonable doubt that no taint of UCI or prejudice remained at that point in the trial. He suggested that his successor judge allow additional *voir dire* and publish White Letter 3-12 to the members, but the successor judge failed to follow that recommendation. As noted above, we review *de novo* his conclusion that any appearance of UCI was cured.

16

had no prejudicial impact on the court-martial." *Id*. (citing *Biagase*, 50 M.J. at 150-51).

We review allegations of UCI not only for actual UCI, but also for the appearance of UCI. "Congress and (the Court of Appeals for the Armed Forces) are concerned not only with eliminating actual unlawful command influence, but also with 'eliminating even the appearance of unlawful command influence at courts-martial.'" *United States v. Lewis,* 63 M.J. 405, 415 (C.A.A.F. 2006) (citing *United States v. Rosser*, 6 M.J. 267, 271 (C.M.A. 1979)). The mere appearance of unlawful command influence may be "'as devastating to the military justice system as the actual manipulation of any given trial.'" *United States v. Ayers*, 54 M.J. 85, 94-95 (C.A.A.F. 2000) (quoting *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991)).

The test for the appearance of UCI is objective. "We focus upon the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." *Lewis*, 63 M.J. at 415. An appearance of UCI arises "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id*.

### IV.  Analysis and Discussion

Approaching this case chronologically, we first conclude that the appellant met his threshold burden at trial: that is, the defense in its initial motion showed some evidence of UCI that had a logical nexus to his case. We conclude that the comments quoted *supra* in those sections entitled "Specific Comments Regarding Sexual Assault" and "Specific Comments Regarding Accountability" created an appearance of UCI. That is, we conclude that a disinterested observer, knowing that potential court-martial members heard this very personal appeal in April from the CMC to "fix" the sexual assault problem, would harbor significant doubts about the fairness of a sexual assault trial held shortly thereafter in June.[59] Compounding the appearance problem, the CMC was still traveling on the Heritage Brief tour the week that the trial began, with both national and military media coverage of his remarks in full swing.

---

[59] Moreover, we note that, on the date of the Heritage Brief at Parris Island, the appellant was pending trial by general court-martial for sexual assault offenses. The panel for his specific court-martial had been identified, and eight panel members were sitting in the audience. Those panel members heard the CMC's comments from a unique perspective - that of prospective members of a pending court-martial.

LtCol Palmer, faced with this evidence, concluded that the defense had failed to show any nexus between the CMC's remarks and the case at bar. That decision was in error. His concomitant failure to grant any remedies represents a critical missed opportunity to take the steps necessary to remove the appearance of UCI from this trial. "[O]nce unlawful command influence is raised, 'we believe it incumbent on the military judge to act in the spirit of the Code by avoiding even the appearance of evil in his courtroom and by establishing the confidence of the general public in the fairness of the court-martial proceedings.'" *United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002) (quoting *Rosser*, 6 M.J. at 271)). A military judge has the inherent authority and duty to intervene and protect the court-martial from the effects of apparent UCI. LtCol Palmer failed to do so upon initial motion of the appellant.

The following morning, after a lengthy day of *voir dire* and challenges, the defense renewed their UCI motion, noting that the members' responses during *voir dire* established the nexus that LtCol Palmer had found missing and shifted the burden to the Government. Without reference to the *Biagase* standard and without addressing this argument, LtCol Palmer again denied the motion, with the curiously inaccurate explanation that most of the challenges he granted the evening before had little or nothing to do with the Heritage Brief or related issues. Upon our review, this obdurate refusal to acknowledge what was obvious – that the defense had met its low threshold burden – and his mischaracterization of the challenges and excusals only exacerbates the troublesome appearance of UCI.

Those concerns are further exacerbated when LtCol Palmer gave a two-hour PME lecture to junior officers the following week in which he highlighted Congress's mistrust of the Marine Corps legal system and desire for more convictions. These comments would be deemed injudicious at any time. Given the fact that LtCol Palmer was the presiding judge in a case in which he denied a defense motion alleging UCI over these issues, a decision over which this court issued a stay of proceedings, his comments only heightened the appearance of unlawful influence in these proceedings.

We turn next to the reconsideration of the UCI motion in August 2012, after the stay was lifted and after LtCol Palmer had left both this case and the trial bench. Upon his reconsideration of the UCI motion, Col Daugherty appropriately identified those portions of the Heritage Brief that gave rise

18

to an appearance of UCI.[60]  He then properly reversed the prior ruling, and found that the defense had met its initial burden of showing some evidence of UCI that had a logical nexus to the case: "Under the apparent UCI standard a disinterested observer, fully informed of all the facts and circumstances, could harbor significant doubt as to the fairness of these proceedings because the members attended or are aware of the Commandant's Heritage Brief and its content."[61]  We agree.

But Col Daugherty then concluded "beyond a reasonable doubt that the voir dire, the liberal granting of challenges by Judge Palmer and the remedial actions taken, the passage of time, and the availability of all favorable defense witnesses have removed any taint of UCI or prejudice at this point in the trial."[62]  We disagree.

We first examine Col Daugherty's conclusion that "the voir dire process effectively remove[d] the taint of the apparent UCI."[63]  The *voir dire* process in fact did not remove the taint, but instead clearly established that there was an appearance of UCI.  It revealed, *inter alia*, that eight of the thirteen members had attended the brief; that they had been exposed to media coverage of the Heritage Brief and the CMC's tour of Marine installations; that virtually all of them recalled and most of them accepted the CMC's statement that 80 percent of sexual assault complaints are legitimate; and that they took away from the brief that the CMC was frustrated or disappointed with leaders that failed to hold Marines accountable for sexual assault.  At least two members, both lieutenant colonels, conceded that prospective panel members could be influenced by the CMC's comments to convict or to punitively discharge.  These responses certainly do not ameliorate the taint, or in any way restore the confidence of a disinterested observer in the process.  *Lewis*, 63 M.J. at 415.

We turn next to Col Daugherty's conclusory statement that LtCol Palmer liberally granted challenges.  We disagree.  Of the five panel members who were impanelled, four had attended the

---

[60] We adopt the findings of fact contained in AE CXLV, with the exception of #49, which concludes that LtCol Palmer "liberally granted challenges for cause."  Recognizing that "liberally" is a subjective standard, we nevertheless conclude that this finding is not supported by the record.

[61] AE CXLV at 23-24.

[62] *Id*. at 25-26.

[63] *Id*. at 25.

brief, two explicitly stated that they believed the CMC's 80 percent statistic, and one of those said she believed that the other 20% may also be true. That member also acknowledged that the CMC's comments may have "some bearing" on her deliberations. LtCol Palmer denied defense challenges for cause on all those members. Moreover, LtCol Palmer denied a challenge for cause on MSgt H, who also accepted the CMC's comments with a large measure of credulity (i.e., "[L]ike I said, he has knowledge of those things. So if he said it happens, it happens."[64]). The defense was then forced to use its peremptory against this member. We conclude that, although LtCol Palmer mentioned the liberal grant mandate, he failed to actually apply it. As for "the remedial actions taken," upon which Col Daugherty in part relies, the record contains no evidence of those.

Finally, we address the defense's argument upon renewal of their UCI motion that LtCol Palmer's PME lecture demonstrated that he himself was tainted by the Heritage Brief when it was introduced into evidence at this trial. While we agree with Col Daugherty's conclusion that LtCol Palmer "was not influenced or biased in any rulings or actions by the Heritage Brief,"[65] that conclusion fails to recognize the *appearance* of taint caused by LtCol Palmer's remarks about Congressional and CMC disapproval immediately on the heels of the litigation of the UCI motion.

In sum, contrary to Col Daugherty's conclusion in the middle of trial, we find that the appearance of UCI had actually worsened with the *voir dire*, the less-than-liberal rulings on challenges, LtCol Palmer's refusal to acknowledge that the burden had shifted, and his subsequent remarks at the PME lecture. Col Daugherty's failure to grant any remedies, having found apparent UCI, represents another critical missed opportunity to remove the taint of apparent UCI from this trial.

Finally, we turn our attention to 11 October 2012, when this trial reconvened with members to pick up in the middle of the Government's case-in-chief. Despite the fact that the issue of UCI had now been litigated on three occasions, the presiding judge failed to even mention, much less publish and instruct upon, the curative White Letter 3-12. This juncture was the last best chance to persuade a disinterested observer of the fairness of these proceedings, and that opportunity was lost.

---

[64] Record at 665.

[65] AE CXLV at 25.

Upon our *de novo* review of this entire record, we find an appearance of unlawful command influence. An objective, disinterested observer, fully informed of all these facts and circumstances, would harbor a significant doubt as to the fairness of these proceedings in which members of the panel appear influenced by the CMC's brief, LtCol Palmer ruled erroneously on the UCI motion and failed to shift the burden to the Government, and successor judges failed to cure that taint. In our view, this fosters the "'intolerable strain on public perception' of the military justice system which the proscription against unlawful command influence . . . guards against." *Salyer*, 72 M.J. at 427.

We now test for prejudice. *Id.* Typically, the question of prejudice hinges in part on whether any remedial measures taken by the military judge were sufficient to cleanse the trial, but here there are none for us to consider. Regardless, "the ultimate question is whether the Government has convinced us beyond a reasonable doubt that 'the disinterested public would now believe that [Appellant] received a trial free from the effects of unlawful command influence.'" *Id.* (quoting *Lewis*, 63 M.J. at 415).

"A sometime problem with an effects-based prejudice test is that one cannot ultimately know what would have happened differently . . . ." *Id*. We do not know what the verdict or sentence would have been had LtCol Palmer found that the defense met its initial burden, that the Government did not meet its burden, and significant remedies were granted (i.e., supplemental questionnaires, a venire restricted to members who had not attended the brief, or several additional peremptory challenges). What we do know is that those remedies, combined with a genuine application of the liberal grant mandate would have drastically, if not completely, altered the composition of this panel.

We are not convinced beyond a reasonable doubt on appeal that the Government has met its burden of demonstrating that the findings and sentence were not affected by the appearance of UCI. We specifically reject Col Daugherty's conclusion that the apparent UCI had cured itself with *voir dire*, challenges, and the passage of time. As a result, an objective member of the public would be left with the appearance and the impression that LtCol Palmer's flawed rulings, both on the UCI motion and on defense challenges, infected the verdict and sentence: the members whom LtCol Palmer impanelled as the appellant's jury sat

21

for the remainder of the trial, with no curative action or instruction by either of the two successive judges.

We turn now to the question of remedy. In both *Lewis* and *Salyer*, the Court of Appeals for the Armed Forces dismissed all charges with prejudice, as a rehearing would have left those appellants in a position in which "'from an objective standpoint, the Government has accomplished its desired end and suffered no detriment or sanction for its actions.'" *Salyer*, 72 M.J. at 428 (quoting *Lewis*, 63 M.J. at 416.) Those cases turned on quite particular facts, in which the Government, acting through its trial counsel, had successfully sought the removal of a presiding judge. This case is neither *Lewis* nor *Salyer*. In contrast, on the specific facts of this case, allowing a retrial does not unfairly advantage the Government.

## V. Conclusion

The findings of guilty and the sentence are set aside. A rehearing may be ordered. The record is returned to the Judge Advocate General for transmission to the CA for such further action as is deemed appropriate, consistent with this decision. *United States v. Abdirahman*, 66 M.J. 668, 683 (C.A.A.F. 2008).

Judge McFARLANE concurs.

WARD, Senior Judge (concurring in the result):

Because the initial trial judge failed to recognize the potential impact of the Heritage Brief on the prospective venire, particularly once he excused three members for cause due to their responses, I find error. Furthermore, I agree with the majority that under the unique circumstances of this case dismissal without prejudice is the appropriate remedy. The majority's view of the *voir dire* here could be read as not only failing to cure the appearance of unlawful influence but also failing on an implied bias analysis. *United States v. Howell*, No. 201200264, unpublished op., slip op. at *9-11, 19-20 (N.M.Ct.Crim.App. 22 May 2014). To that extent, I write separately to emphasize what I see as a critical distinction between testing a prospective member for implied bias and, more importantly, determining whether, once raised, the appearance of unlawful influence is effectively cured.

22

Both tests are similar in that they focus on an objective observer's viewpoint. *United States v. Stoneman*, 57 M.J. 35, 42 (C.A.A.F. 2002). The former looks to whether an objective observer would believe that most members in the same position would be prejudiced. *United States v. Napolitano*, 53 M.J. 162, 167 (C.A.A.F. 2000). In contrast, the latter examines whether as "viewed through the prism of [*United States v.*] *Biagase*[*, 50 M.J. 143, 150 (C.A.A.F. 1999)] and the presumption of prejudice" that same observer, initially concerned over the appearance of unfairness, now no longer harbors any significant doubt as to the impartiality of the member. *Stoneman*, 57 M.J. at 42. Furthermore, once raised the latter test requires proof beyond a reasonable doubt.

The majority does not hold or intimate that the Heritage Brief constitutes unlawful influence on any tribunal or that it *per se* creates any appearance thereof. I agree. Much of the Heritage Brief in my mind reflects lawful command influence. Reasonable minds can disagree as to attendant meanings from certain remarks. In many ways, the CMC's remarks in regard to sexual assault reflect a broader, ongoing debate that extends well beyond our military.

Regardless of how one characterizes any particular remark, the fact remains that four of the five members ultimately impaneled heard the brief approximately eight weeks before trial. Those four members likely knew of their upcoming jury duty when they heard the brief. By the time they entered the courtroom, the Heritage Brief was garnering an ever increasing amount of media attention, a fact borne out during *voir dire*. Finally, the instant case framed many of the same issues addressed during the Heritage Brief, including common perceptions of sexual assault allegations, the issue of consent, and accountability for offenders. All these facts were before the military judge when the defense voiced their concern over the appearance of unlawful influence on the panel. Still, the military judge denied the defense motion and proceeded with *voir dire*.[1]

---

[1] When initially discussing the defense motion, the military judge acknowledged that effective remedies may need to be employed depending on the evidence put forth. Record at 302-03. He also indicated to counsel that

General and individual *voir dire* spanned over 337 pages of transcript and lasted approximately nine hours. True, the military judge allowed extensive questioning on the subject of sexual assault, the Heritage Brief, and an assortment of related topics. But he failed to exercise much, if any, control over the questioning, which at times delved into largely irrelevant matters beyond the members' knowledge.

Like the majority, I find that the *voir dire*, while extensive, was largely ineffective in resolving any appearance of influence on the panel from the Heritage Brief. Despite this issue being raised, the military judge avoided the subject altogether during his own group *voir dire* and he gave no prophylactic instructions to the panel.[2] Moreover, even though he may have intimated at the onset that he would liberally grant challenges, he failed to do so. Instead, he appeared satisfied with simply allowing both parties unfettered access while exercising little control over the end result or attendant effects. Once *voir dire* was complete, the military judge faced one additional key fact – his excusal of three members for the very concerns articulated by the defense.

The very issue complained of by the defense, namely that a reasonable member of the public could perceive certain remarks from the Heritage Brief as influencing a court-martial member's views on evidence and punishment, was readily apparent by the end of *voir dire* when the military judge excused three members for cause based on their responses. Trial judges must remain vigilant when, in cases such as these, the unique confluence of timing and subject matter of comments from a commander, senior official or service chief implicate similar issues in a pending court-martial. *United States v. Dugan*, 58 M.J. 253, 258

---

*voir dire* on the subject of the Heritage Brief and the ensuing media attention in recent cases "has been very liberal." *Id*. at 306. Later when discussing *voir dire* with counsel, he acknowledged the need for "wide latitude" on these matters and his obligation to "jump in there and ask questions to really see the impact of the [CMC]'s speech on these particular members in this case." *Id*. at 480-81.

[2] On one occasion, the military judge interrupted detailed defense counsel during individual *voir dire* and instructed the member to "[p]ut the Commandant's speech completely out of [her] mind." Record at 654. Other than this one instance, the military judge made no other foray into the subject with either the panel or any individual member.

(C.A.A.F. 2003) (citing *United States v. Baldwin*, 54 M.J. 308, 310 (C.A.A.F. 2001)).

The initial military judge should have reconsidered his earlier ruling, found the appearance of unlawful influence on the venire sufficiently raised, and then turned to the subject of curative measures. Had he done so, as the majority points out, he would have had a wide range of options. At a minimum, however, he should have reconsidered his rulings on challenges for cause and excused any remaining member whose responses did not remove any lingering doubt as to the appearance of influence – such as Master Gunnery Sergeant P, whose disavowals of any influence from the brief, *see Howell*, slip op. at *10-11, 19-20, were less than resounding.

Once the appearance of unlawful influence on a venire is raised, military judges must determine whether the *voir dire* as a whole resolved the appearance of unfairness in the mind of the objective observer. *Stoneman*, 57 M.J. at 42. That is an additional task beyond determining whether implied bias exists. A military judge must gauge the candor and content of each member's response with caution before concluding that the objective observer no longer harbors any significant doubt as to the fairness of the proceedings. That may require affirmative steps beyond simply providing wide latitude during *voir dire*.

Our superior court has not definitively addressed the interplay between member disqualification for implied bias and curing the taint stemming from apparent UCI on a prospective venire. Considering the differing burden allocation, the quantum of proof required, and the heightened sensitivity attendant to the issue of unlawful command influence, I agree with the majority that this *voir dire* failed to effectively remove the appearance of unlawful influence.

As to the nearly four-month delay before trial recommenced, we cannot assume that these five members were privy to White Letter 3-12. Moreover, as explained *supra*, these five members already heard the testimony of the victim and a significant portion of the testimony of the Government's principal corroborating witness before trial recessed, and each reviewed a transcript of that same testimony when trial recommenced. Therefore, I am not convinced that the delay itself ameliorated

25

the taint. Similarly, the fact that the military judge presiding when trial recommenced failed to heed Colonel Daugherty's suggested prophylaxis and instruct the panel on White Letter 3-12 offers little comfort to the concerned observer.

The appearance of unlawful influence on a venire requires heightened vigilance in the courtroom beyond that normally afforded to implied bias. Although both tests rely on an objective viewpoint, apparent unlawful command influence, with its presumptive prejudice, requires a more stringent test since there already exists a jaundiced view in the eyes of the objective observer. Because the initial military judge failed to do more than simply test for implied bias and that failure prejudiced the appellant, I concur with the relief granted in the majority opinion.

For the Court



R.H. TROIDL
Clerk of Court