# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

―――――――――――――

## No. 201500388

―――――――――――――

## UNITED STATES OF AMERICA
Appellee

v.

## JOSEPH W. CHAMBLIN
Staff Sergeant (E-6), U.S. Marine Corps
Appellant

―――――――――――――

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Colonel G.W. Riggs, USMC.
Convening Authority: Commanding General, Marine Corps Combat Development Command, Quantico, VA.
For Appellant: Lieutenant R. Andrew Austria, JAGC, USN.
For Appellee: Major Cory Carver, USMC; Lieutenant Megan Marinos, JAGC, USN.

―――――――――――――

Decided 8 November 2017

―――――――――――――

Before HUTCHISON, FULTON, and SAYEGH, *Appellate Military Judges*

―――――――――――――

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

―――――――――――――

FULTON, Judge:

A military judge, sitting as a special court-martial, convicted the appellant, consistent with his pleas, of one specification of willful dereliction of duty, two specifications of violating a lawful general order, and one specification of wrongfully urinating on deceased enemy combatants in violation of Articles 92 and 134, Uniform Code of Military Justice (UCMJ).[1]

―――――――――――――

[1] 10 U.S.C. §§ 892 and 934 (2008).

The military judge sentenced the appellant to 30 days' confinement, 60 days of restriction, reduction to pay grade E-3, forfeiture of $500.00 pay per month for six months, and a $2000.00 fine. The convening authority (CA) approved only so much of the sentence as provided for 30 days' confinement, forfeiture of $500.00 pay per month for six months, and reduction to pay grade E-5. In accordance with a pretrial agreement (PTA), the CA then suspended all confinement and adjudged forfeitures of pay in excess of $500.00 pay per month for one month.

We have jurisdiction because on 4 May 2016 the Judge Advocate General of the Navy sent this case to us under Article 69(d), UCMJ.[2] Having received the case from the Judge Advocate General, we review it under Article 66, UCMJ.[3] Our review is limited, however, in that we may take action only with respect to matters of law.[4]

The appellant raises two assignments of error. First, he argues that that the government's failure to disclose evidence of unlawful command influence (UCI) violated his right to discover exculpatory evidence under *Brady v. Maryland*.[5] Second, he argues that the Commandant of the Marine Corps (CMC) and his subordinates exerted UCI over his court-martial. Because we resolve this case on grounds of apparent UCI, we do not reach the first assigned error.

## I. BACKGROUND

### A. Desecration of deceased enemy combatants

In July 2011, while conducting combat operations in Afghanistan, the appellant and six other Marines engaged the enemy, killing three insurgents. After recovering the bodies, the Marines posed for photographs with the deceased enemy combatants and urinated on them. The photographs of the Marines posing with the bodies were posted online and a video of them urinating on the bodies surfaced on YouTube in January 2012. Senior Department of Defense officials, including the Secretary of Defense and the CMC, made public statements condemning these actions.

### B. Evidence of UCI between the CMC and the first consolidated disposition authority (CDA)

On 13 January 2012, the CMC, General (Gen) James Amos, appointed Lieutenant General (LtGen) Thomas Waldhauser, USMC, as the CDA for the

---

[2] 10 U.S.C. § 869(d) (2012).

[3] 10 U.S.C. § 866 (2012).

[4] 10 U.S.C. § 869(e) (2012).

[5] 373 U.S. 83 (1963).

desecration cases. In this role, LtGen Waldhauser was to initiate investigations into the desecration and other acts of indiscipline and take appropriate administrative or disciplinary actions in all of the cases. The appointment letter stated that the appropriate disposition of any allegations was within his "sole and unfettered discretion."[6] In order to determine appropriate punishments for the Marines involved, LtGen Waldhauser and his team researched how cases involving similar behavior had been handled in the past. While those cases typically resulted in nonjudicial punishment (NJP) or letters of reprimand, LtGen Waldhauser believed that these cases were "more egregious and thus may have warranted disposition at a higher forum."[7]

On 31 January 2012, LtGen Waldhauser updated the CMC on the desecration cases, stating that he had "ruled out referring any of the Marines to trial by General Court-Martial."[8] LtGen Waldhauser met privately with the CMC in February 2012 during a Middle East trip. According to LtGen Waldhauser's affidavit, during the meeting the CMC stated that the Marines involved in the desecration cases needed to be "crushed" and discharged from the Marine Corps.[9] LtGen Waldhauser explained that he was considering referring the cases to forums "in the range of NJP or Summary Courts-Martial for the Sergeants and Special Courts-Martial for the Staff Sergeants."[10] According to LtGen Waldhauser's declaration the conversation continued as follows:

> The CMC asked me specifically something to the effect of why not or will you give all of them General Court-Martials? I responded, "No, I'm not going to do that," . . . stating that I did not believe any of the cases warranted General Court-Martial. The CMC told me he could change the Convening Authority . . . and I responded that would be his prerogative.[11]

After this meeting, the CMC decided to designate a new CDA. In a letter withdrawing LtGen Waldhauser's CDA designation, the CMC wrote:

> I believe some of my comments during our recent conversation could be perceived as possibly interfering with your

---

[6] Appellant's Motion to Attach of 8 Nov 16, Encl. 2 at 1.

[7] *Id.*, Encl. 5 at 2.

[8] *Id.*

[9] *Id.* at 2-3.

[10] *Id.* at 3.

[11] *Id.*

independent and unfettered discretion to take action in those cases. To protect the institutional integrity of the military justice process, and to avoid any potential issues, I withdraw your CDA designation.[12]

Two days later, the CMC contacted LtGen Waldhauser again and "admitted that he had crossed the line and that replacing [him] as CDA was how he was going to fix that."[13]

In place of LtGen Waldhauser, the CMC appointed LtGen Richard Mills, Commanding General, Marine Corps Combat Development Command (MCCDC). LtGen Mills was assisted by his staff judge advocate (SJA), Colonel (Col) Jesse Gruter, and the Deputy SJA, Major (Maj) James Weirick. Shortly before LtGen Mills's appointment, the deputy SJA to the CMC, Col Joseph Bowe, informed Col Gruter of the pending appointment. He told Col Gruter that he "need not be concerned" with why LtGen Mills was being appointed CDA,[14] and specifically directed Col Gruter not to speak to LtGen Waldhauser or his SJA about the case.

## C. Other instances of alleged UCI following appointment of new CDA

The appellant alleges that even after LtGen Mills was designated as the new CDA, the CMC's office continued to improperly influence the handling of the appellant's case. The appellant relies on affidavits from Col Gruter and Maj Weirick to support this contention. These affidavits are not disputed by the government, and we accept them as truthful. They detail the involvement of senior civilian and uniformed attorneys in the appellant's case even after the CMC appointed LtGen Mills as the new CDA.

*1. Involvement of Counsel to the CMC and improper classification of evidence*

Even after LtGen Mills assumed the case, a lawyer associated with the CMC, Mr. Robert Hogue, remained involved. In his affidavit, Col Gruter states that Mr. Hogue, a civilian attorney in the Navy Office of the General Counsel who serves as the senior legal advisor to the CMC, told Col Gruter and two other senior judge advocates that "he was involved in all the things he was hired to do and all those things he was directed to do by the CMC."[15] Mr. Hogue stated that his involvement in the desecration cases "fell in the

---

[12] *Id.*, Encl. 4.

[13] *Id.*, Encl. 5 at 4.

[14] *Id.*, Encl. 6 at 1.

[15] *Id.* at 3.

latter category, and that everything dealing with the [desecration] cases went through him."[16]

On 29 February 2012, Mr. Hogue sent an action memorandum to LtGen Richard Tryon, Deputy Commandant, Headquarters Marine Corps Plans, Policies, and Operations, requesting that he classify photographs and videos associated with this case as Secret. Col Gruter and Maj Weirick took the position that the classification of this evidence was not supported by the applicable classification guidelines—a position shared by security managers both at MCCDC and Headquarters Marine Corps as well as LtGen Mills. Col Gruter brought the matter to the attention of the Deputy SJA to the CMC, Col Bowe, but LtGen Tryon classified the evidence as Secret anyway. Col Bowe told Col Gruter that the matter was decided and that the CDA needed to "make it happen."[17] The government concedes that "standard procedures were not followed in coming to this classification decision."[18]

*2. Attempted replacement of the CDA's SJA*

In his affidavit, Col Gruter asserts that the SJA to the CMC, Major General (MajGen) Vaughn Ary, sought to replace him shortly after he complained to Col Bowe about the improper classification of evidence over the CDA's objection:

> Shortly after making our concerns regarding the classification issue known to both Judge Advocate Division and the Office of General Counsel, Major General Vaughn Ary, the Staff Judge Advocate of the Marine Corps, attempted to replace me as SJA to MCCDC. Major General Ary called and informed me that he wanted to replace me because he needed somebody more senior who could talk "inside the Beltway" about the [desecration] cases; that he wanted a more connected SJA . . . . I informed Lieutenant General Mills of Major General Ary's intentions. Lieutenant General Mills was unhappy with this turn of events. He supported the work I had done to that point generally and specifically on the [desecration] cases. I believe it was his support that deterred Major General Ary from replacing me.[19]

---

[16] *Id.*

[17] *Id.* at 2.

[18] Government's Corrected Brief of 14 Apr 2017 at 7 (citation omitted).

[19] Appellant's Motion to Attach, Encl. 6 at 2.

*3. The CMC's Heritage Brief*

While the appellant's case was pending, the CMC and the Sergeant Major of the Marine Corps presented a mandatory, all-officer brief known as the "Heritage Brief" at Quantico, Virginia. Although the Sergeant Major and CMC gave different briefs, both featured the appellant. The brief first came to the attention of Col Gruter when a civilian defense counsel representing the appellant forwarded the Sergeant Major's brief to him. The brief was entitled, *What Does America Think of Her Marines Today?* On the first and sixth slides of the Sergeant Major's brief was a still photo of the implicated Marines urinating on the deceased insurgents. Both briefs included at least one such picture.

Col Gruter expressed concern to judge advocates at Judge Advocate Division (JAD), a headquarters unit that supports the SJA to the CMC, and to Mr. Hogue that the brief might contaminate the members pool and that it represented UCI. Maj Weirick obtained a copy of the CMC's version of the brief, which Col Gruter reviewed. Col Gruter advised LtGen Mills not to attend the Heritage Brief, and LtGen Mills followed the recommendation. In his affidavit, Col Gruter states that the brief caused him concern because "the brief given by the Commandant, regardless of whatever comments followed, displayed what can fairly be categorized as evidence (the still photo of the Marines urinating on the deceased) that would be used in any court-martial . . . ."[20]

*4. The Executive Off-Site and "Update and Recommendations" memorandum*

In early May 2012, the CMC met with LtGen John Paxton, the Commanding General of II Marine Expeditionary Force, LtGen Mills, and other senior Marine Corps leaders at an "executive off-site" meeting (EOS). According to Col Gruter, LtGen Mills was asked to provide names of the individuals against whom he intended to take legal action. After LtGen Mills provided these names, he left the meeting and did not participate in subsequent discussions with the group of general officers.[21]

Later that month, LtGen Paxton drafted a memorandum for the CMC containing updates and recommendations relating to Marines suspected of misconduct in the desecration cases. In the memo, LtGen Paxton informed the CMC that "[r]ecommendations are based upon our post[-]EOS discussions . . . ."[22]

---

[20] *Id.* at 3-4.

[21] *Id.* at 5.

[22] *Id.*, Encl. 22 at 1.

LtGen Paxton sent the memo to the CDA's office for review. When he saw the memo, Col Gruter told the MCCDC Chief of Staff that the memo should not be sent to the CMC:

> I emphatically explained that it was not II MEF's responsibility to provide any updates regarding the [desecration] investigation, and that to do so was infringing on CG, MCCDC's role as the CDA. I further explained that if there were to be any updates to anyone, HQMC, CMC, JAD, or any external agency or even the press, it was Lieutenant General Mills' responsibility, not II MEF. [23]

The Chief of Staff "indicated that he understood,"[24] and said he would contact the II MEF chief of staff and explain Col Gruter's concerns. Nevertheless, the "update and recommendations" memo was sent to several senior leaders, including the CMC and his SJA, without Col Gruter's knowledge.

*5. Headquarters influence in PTA negotiations; delayed and denied discovery*

Around four months later, Col Gruter visited Col Bowe at JAD to update him on the desecration cases. The SJA to the CMC, MajGen Ary, saw Col Gruter there. Col Gruter described the meeting in his affidavit:

> Major General Ary asked me to update him on the status of the . . . cases. I reported that it appeared promising that all of the Marines were going to enter into pre-trial agreements or lower forum agreements. Major General Ary responded that all the snipers needed to "waive all waiveable motions", and that the waiver needed to be included in the PTAs. At the time, I was already concerned about the appearance of UCI, because of the change in the CDA; the classification of the videos (not ordered by the CDA) and investigation; the legal hold of the entire battalion (also not ordered by the CDA); and CMC's Heritage Brief. I agreed that in light of the appearance of UCI, though all the events appeared to be reasonably explainable, it would be good practice to have the accused waive this motion specifically. After confirming this was the best practice, Major General Ary reiterated that the accused were to "waive all motions.

---

[23] *Id.*, Encl. 6 at 4.

[24] *Id.*

> I was very concerned about the manner in which major General Ary pressed the need to include a motions waiver clause to the point of repeating it after I had acknowledged the "best practice."[25]

Col Gruter was not yet aware of the circumstances surrounding LtGen Waldhauser's relief as CDA, nor was he aware that LtGen Paxton had sent the "updates and recommendations" email to the CMC over his objection.

On 18 October 2012, the government certified that it had completed its discovery obligations to the appellant. Six days later, Col Gruter received an email that, at the bottom of a chain of emails, contained a copy of the "update and recommendations" memo. The email chain made it clear that the memo concerning the desecration cases had in fact been sent to the CMC and other senior Marine Corps leaders. In his email to the CMC to which the memo was attached, LtGen Paxton told the CMC, "Your guidance after the EOS was clear and it was communicated and was being executed."[26] Col Gruter "immediately [knew] the email alone presented significant unlawful command influence issues and would need to be produced in discovery to the various accused."[27] Col Gruter believed that "the phraseology of the email made it appear as if the CMC had given particular direction or guidance" in the desecration cases and that the general officers who participated in its creation "had reached a collective agreement in the 'execution of . . . justice.'"[28]

We have examined the memorandum ourselves. While it is certainly evidence of headquarters-level interest in these cases, nothing in the memo indicates that responsibility for making decisions about courts-martial lay with anyone other than LtGen Mills. Most of the memorandum focuses on the disposition of Marines whose cases were not destined for court-martial. In short, we do not find the "updates and recommendations" memo itself to be evidence of UCI. Nevertheless, it is not surprising that in the context of this case Col Gruter thought that this information should come from the CDA.

Upon learning that the memo had been sent without his knowledge, and based on his earlier conversation with the SJA to the CMC in which MajGen Ary emphasized that the accused Marines were to "waive all motions," Col Gruter decided that the memo had to be turned over to defense counsel. He forwarded the memo to the trial counsel and, after discussing the matter with

---

[25] *Id.* at 6.

[26] *Id.*, Encl. 22 at 2.

[27] *Id.*, Encl 6 at 4.

[28] *Id.* (alteration in the original).

trial counsel, decided to secure PTAs in the cases first, release the memo after PTAs had been accepted, and then secure waivers for the anticipated UCI motions. Col Gruter did not believe that the accused Marines could appropriately waive motions without knowing about the "update and recommendations" memo.

On 15 November 2012, the appellant and the government entered into a PTA. On 28 November 2012, the government provided the appellant with the "update and recommendations" memo. That same day, trial defense counsel filed a discovery request. The appellant asked for, among other things, "Any talking points, notes, outlines, guidance, or written communications (including email) regarding the intent of the Commandant of the Marine Corps and the disposition of the Accused's and related cases."[29]

The government replied to this request by claiming that it had "reasonably provided all known evidence" except for certain classified matters.[30] In fact, the government had not disclosed any of the CMC's statements about the desecration cases or his letter to LtGen Waldhauser explaining his relief.

The Deputy SJA for the CDA, Maj Weirick, recounts in his affidavit the steps he took to obtain discovery related to UCI in this case:

> [T]his discovery was requested by the defense counsel for SSgt Chamblin . . . . And, there was clearly a duty on my part to look beyond my own files for evidence . . . .
>
> From the attached emails . . . it is clear that I had made every effort, beginning in November 2012, to request documents of this type to be produced in discovery. I have read receipts for all of these emails. I tried to include every lawyer, or their action officer, at HQMC . . . who would have had access to these documents. None of these email requests were ever answered.
>
> One of the most troubling aspects of this matter is that a number of accused pleaded guilty without access to this discovery. . . . Further, the CMC's letter of 10 February 2012 which removed LtGen Waldhauser as the CDA, was never provided to the accused in the [desecration] cases despite my repeated requests . . . for UCI related materials.[31]

---

[29] *Id.*, Encl. 24 at 1.

[30] *Id.*, Encl. 25 at 1.

[31] *Id.*, Encl. 7 at 2.

The appellant did plead guilty and was sentenced on 19 December 2012. The convening authority acted on 21 February 2013.

*6. Col Gruter recuses himself*

Even after the appellant pleaded guilty, Col Gruter continued to be frustrated with what he saw as headquarters-level interference in the remaining desecration cases:

> During the last week of April, I learned that [a noncommissioned officer facing possible discipline] was allowed to retire from the Marine Corps. I was upset with this action because of the initial work that was done to identify all the Marines the CDA intended to take legal action against . . . to ensure they were not separated before action could be taken. I called Lieutenant Colonel Brostek [a judge advocate attached to JAD] on 2 May to voice my displeasure that [the NCO] had been retired; I informed him that I viewed this as yet another example of HQMC creating problems in the [desecration] cases. I also informed him that, if there was one more incident smelling of UCI in these cases, I would recuse myself and recommend to Lieutenant General Mills that he recuse himself. I also stated that if there were evidence of actual UCI, I recommended that the entirety of JAD recuse themselves from this matter.[32]

Col Gruter did not have to wait long for a headquarters action that—at least in his mind—evidenced actual UCI:

> Shortly thereafter, on 10 May 2013, a professional responsibility complaint was filed against me at the HQMC level regarding a matter that began over two years ago. I feel to some degree the timing of this was in retaliation for my statement that I would not tolerate additional interference from HQMC on the handling of the [desecration] cases and was on the verge of self-recusal.
>
> As a result of the professional responsibility complaint, I felt I had no choice but to recuse myself from the [desecration] cases, though LtGen Mills protested my recusal and stated his dissatisfaction with the professional responsibility complaint. I felt the professional responsibility complaint compromised my position as an SJA beyond repair and when taken together with the initial attempt to have me removed . . . as SJA as well

---

[32] *Id.*, Encl. 6 at 7.

as the continual unilateral action taken by HQMC in the [desecration] cases only contributed to an already adversarial relationship between my office and JAD.[33]

## II. DISCUSSION

The appellant alleges that his case was affected by UCI and that we should set aside the findings and sentence and dismiss the charges and specifications with prejudice.

### A. Law applicable to UCI

It has long been a canon of military jurisprudence that UCI is the mortal enemy of military justice.[34] The prohibition against UCI is codified in Article 37, UCMJ, which states in part, "[n]o person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening . . . authority with respect to his judicial acts." UCI can be actual or apparent, and we review cases for UCI *de novo*.[35] When raising UCI for the first time on appeal, the appellant must show something more than an appearance of evil to justify action by an appellate court in a particular case. Proof of UCI "in the air" will not do."[36]

We will focus our analysis on apparent UCI. Unlike actual UCI, which requires prejudice to the accused, "no such showing is required for a meritorious claim of an appearance of unlawful command influence. Rather, the prejudice involved . . . is the damage to the public's perception of the fairness of the military justice system as a whole[.]"[37] In *United States v. Boyce*, the Court of Appeals for the Armed Forces (CAAF) used a two-pronged test for apparent UCI.[38] To prevail, the appellant must show facts, which if true, would constitute UCI. Second, he must show that the UCI placed an intolerable strain on the public's perception of the military justice system because an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.[39]

---

[33] *Id.*

[34] *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986).

[35] *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006).

[36] *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991) (internal quotation marks and footnote omitted).

[37] *United States v. Boyce*, 76 M.J. 242, 248 (C.A.A.F. 2017).

[38] *Id.*

[39] *Id.* at 248-49.

The *Boyce* court set forth an analytical framework for courts to use in applying this standard. First, an appellant must show some evidence that UCI occurred.[40] This is a low burden, but the showing "must consist of more than 'mere speculation.'"[41]

Once an appellant presents some evidence of UCI, the burden shifts to the government to prove beyond a reasonable doubt that "either the predicate facts proffered by the appellant do not exist, or the facts as presented do not constitute unlawful command influence."[42] If the government meets this burden, no further analysis is necessary.[43]

If the government does not meet its burden of rebutting the allegation at this initial stage, then the government may next seek to prove beyond a reasonable doubt that the UCI did not place an intolerable strain upon the public's perception of the military justice system, and that an objective disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding.[44] A determination that the appellant was not personally prejudiced, or that the prejudice caused by the UCI was later cured, is a significant factor to which we must give considerable weight when deciding whether the UCI placed an "intolerable strain" on the public's perception of the military justice system. But such a determination is not dispositive. Rather, we will consider the totality of the evidence in determining whether there is the appearance of UCI.[45]

## B. Application of *Boyce*

As we analyze this case under *Boyce,* we note that most of the facts relating to UCI in this case were not developed in the record of trial. Rather, they are taken from matters we have attached to the record on the appellant's motion. Included in these matters are affidavits from the SJA, Deputy SJA, and the first CDA in this case. The government does not contest the substance of these affidavits, and we therefore accept them for purposes of resolving this appeal.

---

[40] *Id.* at 249.

[41] *Id.* (quoting *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013).

[42] *Id.* (citing *Salyer*, 72 M.J. at 423).

[43] *Id.*

[44] *Id.* at 249-50.

[45] *Id.* at 248, n.5.

### 1. *The appellant's burden of production*

Applying the first prong of the *Boyce* analysis, we find that the appellant has presented evidence of UCI. LtGen Waldhauser's affidavit states that the CMC told him that he wanted the Marines involved in the desecration cases "crushed," and asked why LtGen Waldhauser would not send all the cases to general court-martial. This is clearly some evidence of UCI.

We also find that the appellant has met his relatively low burden of production in other ways. For example, we find that the MajGen Ary's attempt to replace Col Gruter with someone who could talk "inside the Beltway" after Col Gruter protested the irregular classification of evidence constitutes some evidence of UCI. Although he did not know of the CMC's direct involvement in this case at the time, Col Gruter thought that the effort to improperly classify evidence impinged on the CDA and put the case at risk.

We have previously found that Gen Amos's Heritage Brief constituted some evidence of UCI, even when an appellant's offense was not depicted in the brief itself.[46] In this case, the brief contained at least one picture of the appellant urinating on a dead insurgent—an offense that was the subject of a pending court-martial—and asked, "What Does America Think of Her Marines Today?" We find that this brief also meets the relatively low burden of production for UCI.

Completing the first part of the two-part analysis required by *Boyce*, we note that the government has not demonstrated beyond a reasonable doubt that the predicate facts proffered by the appellant do not exist or that they do not constitute UCI. In fact, the government presented no evidence to challenge the credibility of, rebut, or otherwise explain any fact asserted in the affidavits of the first CDA, the SJA, or the Deputy SJA, which we have found constitute some evidence of UCI. The government does argue that the prejudice associated with this evidence has been ameliorated. We take up this claim in the next step of the analysis.

### 2. *The government's burden*

Moving to the second step in the *Boyce* test, we find that the government has not proven beyond a reasonable doubt that the UCI did not place an intolerable strain upon the public's perception of the military justice system. Nor did the government prove beyond a reasonable doubt that an objective

---

[46] *See e.g., United States v. Howell,* No. 201200264, 2014 CCA LEXIS 321, at *2 (N-M. Ct. Crim. App. 22 May 2014) (holding that the appellant raised some evidence of an appearance of UCI by presenting evidence of the CMC's Heritage Brief); *United States v. Jiles*, No. 201200062, 2014 CCA LEXIS 151, at *3-6 (N-M. Ct. Crim. App. 6 Mar 2014) (military judge's actions sufficiently ameliorated any taint or potential taint from apparent UCI caused by Heritage Brief).

disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding.

We will consider the totality of the circumstances, and we begin by considering the nature of the initial UCI in this case. The highest-ranking officer in the Marine Corps told the CDA that the appellant and his co-accuseds should be "crushed." This is an unusually flagrant example of UCI. We find that UCI this direct, and occurring at this level, is highly corrosive to public trust in this proceeding.

Nor was the prejudice of this UCI fully cured. Although there is no evidence that the new CDA was aware of the CMC's conversation with the first CDA, LtGen Waldhauser, the UCI—or more properly, its supposed remedy—prejudiced the appellant. Maj Weirick's affidavit provides evidence that Marine Corps headquarters-level attorneys withheld evidence that the CMC committed UCI from the appellant, the trial counsel, the CDA, and the CDA's SJA. The evidence was withheld in the face of a discovery request that was being processed by the CDA's Deputy SJA. In its brief, the government argues that withholding evidence of UCI was "necessary" because to comply with the request would have subjected the participants in the trial process to the original CMC's original act of UCI. The government's effort to justify this conduct by claiming that it was a necessary part of the government's UCI remedy demonstrates the inadequacy of the remedy. The appellant had a right to discovery *and* a right to a judicial process free from UCI. An accused does not forfeit his right to discovery because the government's preferred UCI remedy requires it.[47] Worse, the discovery was denied *sub silentio* by headquarters-level counsel who failed to disclose the evidence when Maj Weirick asked for it. This frustrated trial counsel's ability to fulfill his obligations as the representative of the United States under the UCMJ and the Rules for Courts-Martial and caused the trial counsel to incorrectly represent to the appellant that all the responsive material had been provided.

Col Gruter, who had recused himself from the desecration cases by the time he learned of the withheld evidence, assessed how this affected his handling of these cases:

> Had I been aware that JAD was actively withholding evidence, I would have insisted that both offices, JAD and the General Counsel Office had a conflict of interest with the Government in any matter regarding [the desecration cases] and demanded their effective withdraw[al] from any role in the matter.

---

[47] *Cf. Simmons v. United States*, 390 U.S. 377, 394 (1968) (". . . we find it intolerable that one constitutional right should have to be surrendered in order to assert another.").

> I would have advised additional remedial measures had I been made aware that Lieutenant General Waldhauser was removed as CDA because of his disagreement with the CMC regarding his proposed dispositions of the [desecration] cases. I would have advised Lieutenant General Mills to proceed in an entirely different manner in these cases. I would have required disclosure of the material to all accused, and recommended that the cases proceed to NJP.
>
> . . . [A]s the facts surrounding the shift in the CDA became known, it was clear to me the most relevant of facts had been withheld from me and that my ability [to] independently and fully advise Lieutenant General Mills was severely and systematically interfered with by Judge Advocate Division.[48]

A member of the public, aware of these facts and this assessment from the CDA's SJA, would lose confidence in the fair processing of this case.

After LtGen Mills was appointed to be the CDA, his SJA and deputy SJA were in many respects quite zealous about protecting the case from UCI. *Boyce*'s hypothetical objective observer would see that Col Gruter's difficulties with headquarters-level counsel in these cases sometimes centered on his efforts to protect the independence of the CDA. It bothered him that the SJA to the CMC seemed to insist on a term in the PTA. And after Col Gruter protested Mr. Hogue's direction to improperly classify the evidence in this case, the CMC's SJA sought to remove Col Gruter as the SJA and replace him with someone who could talk "inside the Beltway" about these cases.

Ultimately Col Gruter did recuse himself. The record does not contain facts about the professional responsibility complaint beyond those contained in Col Gruter's affidavit: that it concerned conduct from two years earlier, and that it followed his complaints about interference in another desecration case. And since Col Gruter's recusal came after the appellant's court-martial, it didn't affect the result. But the few facts we know about the recusal, combined with the attempt to remove the SJA, would color how an objective observer views the continued involvement of senior attorneys close to the CMC in this case.

A member of the public's confidence in the fairness of the proceedings would be eroded by the fact that the CMC made an example of the appellant's conduct in a brief intended for distribution to all officers and senior enlisted Marines. A member of the public would find that displaying a picture of the appellant committing an offense while the court-martial for that offense was

---

[48] Appellant's Motion to Attach, Encl. 6 at 7-8.

pending—and particularly in light of the CMC's earlier conduct in this case—evinces a disregard for the independence of those involved in the judicial process.

The government argues that any UCI committed by the CMC was cured by changing CDAs. Although we agree that there is no evidence that LtGen Mills knew the contents of the CMC's communications with the first CDA, LtGen Waldhauser, as we have discussed, we do not agree that the prejudice to the appellant was completely cured. We have also considered other government arguments regarding the alleged UCI in this case. For nearly every example of potential UCI in this case, one can counter with a reason to overlook it: The appellant received a very favorable PTA; he can hardly claim to have been "crushed" as the CMC might have wanted. His PTA did not contain a term requiring him to waive all motions as the SJA to the CMC had wanted, and such a term would likely have been ineffective anyway. Improper classification of the evidence had the potential to make discovery more difficult but would not have ultimately prevented the appellant's counsel from reviewing evidence, and some motive other than UCI might have motivated the classification decision. Col Gruter advised LtGen Mills to avoid the Heritage Brief, and the appellant pleaded guilty to a military judge. We have considered these arguments in our review of the totality of circumstances, and given consideration to the ways the appellant escaped personal prejudice. But the burden is on the government to show, beyond a reasonable doubt, that the UCI did not place an intolerable strain upon the public's perception of the military justice system and that an objective disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding. We think that such an observer would share the SJA's sense that the CMC and lawyers who reported to him "severely and systematically interfered"[49] with this case and would harbor significant doubt about the fairness of the proceeding. Therefore, the government has not met its burden under *Boyce*.

*3. Remedy*

The appellant urges us to dismiss this case with prejudice. Dismissal is a drastic remedy, and we must consider whether remedies short of dismissal are available.[50] In considering a remedy, we take our approach from two CAAF cases: *United States v. Lewis*[51] and *United States v. Salyer*.[52] In both

---

[49] *Id.*, Encl. 6 at 8.

[50] *United States v. Cooper*, 35 M.J. 417, 422 (C.M.A. 1992).

[51] 63 M.J. 405 (C.A.A.F. 2006).

[52] 72 M.J. 415 (C.A.A.F. 2013).

*Lewis* and *Salyer*, the government achieved the removal of a military judge through the use of UCI.[53] In both cases the CAAF reversed this court and found that remedies that permitted retrial before a different military judge ratified rather than cured the UCI and did not restore public confidence in the system.[54] The CAAF considered that the government's goal in committing the UCI was to remove the judge. Since retrial before the original judge was no longer possible, any remedy allowing for a second trial before a different judge simply would allow the government to benefit from its own misconduct. In *Salyer*, the CAAF also considered that the over-two-and-a-half-year delay weighed against permitting a retrial.[55] Finally, the *Salyer* court found that the government's actions "strike at the heart" of what it means to have a credible military justice system.[56] Dismissal with prejudice was therefore the appropriate remedy in those cases.

We likewise find that public confidence in military justice requires dismissal with prejudice in this case. Nearly six years have passed since LtGen Waldhauser was named the CDA. Like the appellant in *Salyer*, this appellant had a right to a timely trial free from UCI. Col Gruter, who would have recommended that this case be disposed of nonjudicially had evidence not been withheld, has recused himself, and cannot participate further. We find lesser remedies inadequate to the harm. Dismissal of the charges and specifications with prejudice is necessary in this case to "'foster[ ] public confidence in the . . . fairness of our system of justice.'"[57]

### III. CONCLUSION

The findings and sentence are set aside. The charges and specifications are dismissed with prejudice.

Senior Judge HUTCHISON and Judge SAYEGH concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[53] *Lewis*, 61 M.J. 415-16; *Salyer*, 72 M.J. at 428.

[54] *Id.*

[55] *Salyer*, 72 M.J. at 428.

[56] *Id.*

[57] *Boyce*, 76 M.J. at 246 (quoting *Harvey*, 64 M.J. at 17).